IN THE UNITED STATES DISTRICT COURT FOR
THE DISTRICT OF MARYLAND

UNITED STATES OF AMERICA     *

v.     *     Case No. GLR-24-338

MICHAEL CHARLES FITZPATRICK     *

    *    *    *    *    *    *    *    *    *    *    *    *

**OMNIBUS MOTION TO SUPPRESS DIRECT AND DERIVATIVE EVIDENCE
OBTAINED FROM CONSTITUTIONAL VIOLATIONS**

## <u>TABLE OF CONTENTS</u>

INTRODUCTION ................................................................................................................. 1

BACKGROUND .................................................................................................................. 2

ARGUMENT ....................................................................................................................... 6

I.    For The Two Separate Reasons Explained Below, The Court Should Suppress
Ammunition (3 100-Round Boxes of TelAmmo Ammunition) That Was Seized From A Trailer
On Mr. Fitzpatrick's Property. ........................................................................................... 7

    A.    First, The Court Should Suppress The Ammunition Because Officers Discovered The
    Ammunition During An Illegal Search. ........................................................................... 7

    B.    Second, The Subsequent Warrant Affidavit To Search The Trailer And Seize The
    Ammunition Contained Material Omissions That Would Have Defeated Probable Cause. . 12

II.    The Court Should Suppress Mr. Fitzpatrick's Black Tower Computer Because Its
Warrantless Seizure From Linda Rabinovich On March 14, 2017 Was Constitutionally
Improper. .......................................................................................................................... 18

III.    The Court Should Suppress Mr. Fitzpatrick's Black Tower Computer For The Further
Reason That It Was The Subject Of An Improperly Extended Seizure .................................. 21

IV.    The Court Should Suppress Evidence Obtained From The Warrantless Seizure Of
Mr. Fitzpatrick's Cell Phone On March 14, 2017. ............................................................. 24

V.    Motion To Suppress The Contents Of Mr. Fitzpatrick's Samsung Galaxy S8, Which Was
Seized On May 19, 2017, Both As A Violation Of Mr. Fitzpatrick's Sixth Amendment And
Due Process Rights. ........................................................................................................... 26

    A.    Background To The Execution Of The May 19 Warrants ........................................... 26

    B.    Mr. Fitzpatrick Moves To Suppress His Statement Providing His Password To SA
    Jeppi And Any Derivative Evidence, Including The Contents Of The Phone As A Violation
    Of His Sixth Amendment Rights. .................................................................................... 28

    C.    Mr. Fitzpatrick Requests A Hearing To Challenge The Voluntariness Of His Statement
    Providing The Password To Law Enforcement. ............................................................... 30

VI.    Motion To Suppress Evidence From Google That Was Obtained From An Invalid
Warrant. ............................................................................................................................ 32

    A.    Background On The Warrant. .................................................................................... 32

    B.    The Fourth Amendment Requires A Nexus Between The Item To Be Searched And
    Specified Criminal Activity. ........................................................................................... 33

    C.    The Scant Mention Of Mr. Fitzpatrick's Specific Google Account/Email Address Did
    Not Provide An Adequate Nexus To Support The Wide-Ranging Search And Seizure
    Purportedly Authorized By The Warrant. ........................................................................ 38

CONCLUSION .......................................................................................................................... 39

## **INTRODUCTION**

The investigation into Mr. Fitzpatrick began with a fire at his house in the late-night hours of March 10, 2017. The investigation started into the cause of the fire, but then quickly developed into a criminal investigation of illegal possession of firearm and ammunition, arson, and insurance fraud offenses. The investigation was sprawling, including interviews of Mr. Fitzpatrick, interviews of others, and the application for and execution of many state and federal search warrants.[1] The various constitutional challenges raised in this omnibus motion stem from this lengthy investigation. The issues raised herein are as follows:

(1) Motion to suppress ammunition seized from a vehicle trailer on Mr. Fitzpatrick's property on March 13, 2017 because it was discovered through an invalid search that exceeded the scope of Mr. Fitzpatrick's consent.

(2) Motion to suppress ammunition seized from a vehicle trailer on Mr. Fitzpatrick's property on March 13, 2017 because it resulted from an invalid warrant under *Franks v. Delaware*, 438 U.S. 154 (1978).

(3) Motion to suppress Mr. Fitzpatrick's black tower computer because it was seized on March 14, 2017 without a warrant and without valid consent.

(4) Motion to suppress Mr. Fitzpatrick's black tower computer because it was searched after an extended seizure in violation of his possessory interests.

(5) Motion to suppress Mr. Fitzpatrick's Verizon Galaxy S7 because it was seized without a warrant on March 14, 2017.

(6) Motion to suppress Mr. Fitzpatrick's Samsung Galaxy S8, which was seized on May 19, 2017, because of Sixth Amendment and Due Process violations.

(7) Motion to suppress evidence from Google because it was obtained from an invalid warrant.

For the reasons explained herein, the challenged evidence, as well as any derivative evidence, should be suppressed.

---

[1] The Defense has endeavored to capture its understanding of the investigation as accurately as possible in the present motion and appreciates the Government's willingness to answer questions and provide follow up discovery.

**BACKGROUND**

This background section provides an overview of the factual allegations and investigation in this case. Additional details are provided in the argument section that follows.

In the late night hours of March 10, 2017, Howard County 911 received multiple calls reporting a fire at 11910 Emerald Court in Ellicott City. When they responded, firefighters encountered a single-family home on a three-acre plot of land fully engulfed in flames. Thankfully, because Mr. Fitzpatrick – the homeowner – had foot surgery the day before (March 9) and was recuperating at his then significant other's (Linda Rabinovich) home, no one was present at the Emerald Court home.

In the early morning hours of March 11, Mr. Fitzpatrick learned of the fire and, because he was on medicine to help with pain from the surgery, was driven to the scene by his employee and friend, Jonathan Weizman. When he arrived, Mr. Fitzpatrick provided basic background information to law enforcement, including Howard County Police Detective Marc Delbusso. Mr. Fitzpatrick returned to the scene later in the day with Ms. Rabinovich and provided additional information, including that he owned and operated a landscaping business. Because of weather conditions, an investigation into the cause of the fire, which was undetermined at that point, was stalled but the scene remained secured by law enforcement.

On March 12, agents interviewed Mr. Fitzpatrick at Ms. Rabinovich's house. They obtained his consent to search various spaces on his three-acre Emerald Court property—specifically, the residence, a detached garage at the rear of the property, and several vehicle trailers. When signing a consent form to search these items, Mr. Fitzpatrick volunteered to law enforcement that there was a rifle stored in the trailer and that it belonged to Mr. Weizman. Mr. Fitzpatrick advised that he and Mr. Weizman would sometimes go to the range and shoot the rifle.

2

Later that evening (March 12), while conducting the consent search, law enforcement observed a privately manufactured rifle and ammunition in the trailer. The next day (March 13), Det. Delbusso swore out an affidavit for a warrant to seize the ammunition from the trailer. In the warrant, Det. Delbusso wrote that the ammunition was stored in a cardboard box with Mr. Fitzpatrick's name and address on the box, and that he had verified with the Bureau of Alcohol, Tobacco, and Firearms (ATF) that Mr. Fitzpatrick was prohibited from possessing firearms and ammunition due to a prior 2003 conviction of "Theft Scheme $500 plus" in the Howard County Circuit Court. The warrant was issued and the ammunition (1 box containing 3 100-round boxes of .223 caliber TulAmmo ammunition) was seized from the trailer. On March 14 (the next day), Det. Delbusso obtained an arrest warrant for Mr. Fitzpatrick for violating Maryland state laws regarding illegal possession of a regulated firearm and ammunition (Md. Code Ann., Public Safety §§ 5-133(b), 5-133.1).

That same day (March 14), prior to executing the arrest warrant, Det. Delbusso and ATF Special Agent Claire Jeppi went to Ms. Rabinovich's residence. The day prior (March 13), Ms. Rabinovich had contacted Det. Delbusso because she was concerned when she discovered certain belongings of Mr. Fitzpatrick's in her home, including clothing in a closet she did not regularly use and financial and other items in an office she had allowed Mr. Fitzpatrick to use while he was recuperating from foot surgery. On March 14 at approximately 7:00 p.m., Det. Delbusso and SA Jeppi interviewed Ms. Rabinovich and seized a number of electronic devices belonging to Mr. Fitzpatrick, including an external hard drive, a Toshiba Satellite laptop, a Blue Fujifilm XP camera, a Sandisk 8 GB SD Card, a black tower computer, and multiple USB, SD, and other

memory drives. At present, of this category of potential evidence, the Government seeks only to admit evidence from the black tower computer at the trial in this case.[2]

After interviewing Ms. Rabinovich and seizing Mr. Fitzpatrick's property, law enforcement then arrested Mr. Fitzpatrick (around 9:30 p.m.) in front of Ms. Rabinovich's residence. Mr. Fitzpatrick had been working that day and was returning to the residence where he had planned to continue recuperating from surgery. During his arrest, law enforcement seized a Verizon Galaxy S7 cell phone from Mr. Fitzpatrick's person. Law enforcement also seized items from Mr. Fitzpatrick's car—specifically, a computer tablet and a phone that was in a red backpack. Approximately six days later, law enforcement conducted a second search of the red backpack to retrieve a second computer tablet. Of this potential category of evidence, the Government intends to introduce only evidence from the Verizon Galaxy S7.

Following his arrest, Mr. Fitzpatrick was transported to a Howard County police station where he was interviewed by Det. Delbusso and SA Jeppi. At the outset of the interview, Mr. Fitzpatrick was provided *Miranda* warnings orally and in writing. Mr. Fitzpatrick waived his rights and spoke with investigators for approximately an hour and a half before invoking his right to counsel. Mr. Fitzpatrick was released sometime soon thereafter.

Howard County and ATF continued their investigation into Mr. Fitzpatrick and his potential role in the fire that destroyed his home. On March 21, 2017, the ATF assumed primary responsibility for the investigation and Howard County continued to provide investigative support. Many interviews were conducted of Mr. Fitzpatrick's family members, his neighbors, and his business acquaintances, some of which are detailed below.

---

[2] Howard County law enforcement seized additional items from Ms. Rabinovich on March 17, 2017 (money), on March 19, 2017 (a computer hard drive), on March 21, 2017 (a Nikon D7200 camera with lenses and a memory card), and on April 13, 2017 (a HP Pavilion Entertainment PC).

On March 23, 2017, Det. Delbusso applied for a state warrant to search devices taken from Ms. Rabinovich and Mr. Fitzpatrick for evidence of criminal activity. It is unclear whether that warrant was executed and on which devices.

On May 18, 2017, SA Jeppi applied for a federal warrant to search a number of different locations and places—specifically, 11910 Emerald Court, an apartment where Mr. Fitzpatrick was residing in Columbia, Maryland, two of Mr. Fitzpatrick's cars, and Mr. Fitzpatrick himself for evidence related to arson, fraud, and illegal possession of firearms and ammunition. That warrant was executed the next day (May 19) at Mr. Fitzpatrick's Columbia apartment. During the execution of that warrant, SA Jeppi obtained the password to Mr. Fitzpatrick's phone by telling him that she "needed" the password to search it. After doing a preliminary review of the phone (a Samsung Galaxy S8), law enforcement seized the phone, taking it with them. At the time, Mr. Fitzpatrick was represented by counsel (Joseph Murtha) on the then-pending state gun and ammunition charges.[3]

Thereafter, the investigation continued in earnest. In relevant part, the investigation included the following:

- In September 2017, another federal warrant was executed at Mr. Fitzpatrick's lake house.

- In November 2017, a federal warrant was issued to take custody of and search items that had previously been seized during the course of the investigation. This warrant included authorization to search the black tower computer that was seized on March 14, 2017 – eight months prior – but apparently had not yet been searched.

- In September 2018, agents applied for a federal warrant to search a Google account for Mike.rmf@gmail.com and seize a broad array of information contained in that account.

---

[3] Counsel's understanding is that those state charges were placed on the stet docket on October 2, 2017.

In November 2018, agents interviewed Mr. Weizman after multiple prior interviews. During this interview he told law enforcement about a shotgun he claimed was currently in his possession that belonged to Mr. Fitzpatrick. Mr. Weizman told law enforcement that Mr. Fitzpatrick had the shotgun at a lake house in Virginia and subsequently gave it to Mr. Weizman because he did not want it and could not have it. That same day, Mr. Weizman took law enforcement to a family property where he provided them with the shotgun.

In March 2022, Mr. Fitzpatrick was charged with being a felon in possession of ammunition on March 10, 2017. That charge concerned the ammunition (3 100-round boxes of TelAmmo ammunition) that was seized from the vehicle trailer on March 13, 2017. In March 2022, Mr. Fitzpatrick was charged with being a felon in possession from March 12, 2017 to November 8, 2018. That charged was based on the shotgun that was seized from Mr. Weizman. In September 2024, the Court dismissed those charges without prejudice after finding a violation of the Speedy Trial Act. In November 2024, Mr. Fitzpatrick was re-indicted on the same charges, and those are the charges that are pending before the Court.

In September 2022, Mr. Fitzpatrick was charged in Howard County Circuit Court Case No. C-13-CR-22-000417 with first degree arson, conspiracy to commit first degree arson, and three counts of insurance fraud. The trial on those charges is currently scheduled to begin on June 2, 2025.

## **ARGUMENT**

The Defense appreciates the Government's willingness to identify devices and information seized during the investigation in this case that will be used as the source of evidence during trial. Those items are (1) information from Google; (2) a black tower computer seized from Ms. Rabinovich on March 14, 2017; (3) a Verizon Galaxy S7 cell phone seized from Mr. Fitzpatrick

on March 14, 2017; (4) a Samsung Galaxy S8 seized on May 19, 2017 while executing a warrant at an apartment where Mr. Fitzpatrick was residing; (5) an Apple device belonging to Mr. Weizman; (6) ammunition (3 100-round boxes of TelAmmo ammunition) seized from the black vehicle trailer; and (8) a shotgun seized from Mr. Weizman on November 8, 2018. Given the Government's focus, the Defense advances the arguments below on these sources of evidence.

Of course, the Government has a right to change its position. If the Government seeks admission of other evidence gathered during the course of its investigation, the Defense reserves the right to challenge the admission of that evidence on any ground, including constitutional grounds that have not been raised herein for the purpose of saving all parties and the Court time and resources.

I.    **For The Two Separate Reasons Explained Below, The Court Should Suppress Ammunition (3 100-Round Boxes of TelAmmo Ammunition) That Was Seized From A Trailer On Mr. Fitzpatrick's Property.**

A.    **First, The Court Should Suppress The Ammunition Because Officers Discovered The Ammunition During An Illegal Search.**

1.    **Background As To How Law Enforcement Discovered The Ammunition.**

On March 12, 2017, law enforcement (Det. Delbusso and Maryland Deputy State Fire Marshal Dexter Hodges) contacted Mr. Fitzpatrick at Ms. Rabinovich's home and asked for consent to search. Specifically, law enforcement sought to search the following: (1) a black trailer; (2) the 11910 Emerald Court home; (3) a detached garage to the rear of the property (identified in the picture below as "'Shop' (pole-barn)"); (4) a red trailer; and (5) a black and gray trailer. What, exactly, investigators explained as the scope of the search will have to be fleshed out at a hearing, but whatever it was, it was linked to the origin and cause of the fire.

The 11910 Emerald Court property is three acres and includes the home, which was burned down, a detached garage away from the home where Mr. Fitzpatrick stored items for his

landscaping and race car business, vehicle trailers where he did the same, and an RV camper where an employee of Mr. Fitzpatrick's business was living at the time. Mr. Fitzpatrick's property was also used as his commercial business location. A map is below:



The black vehicle trailer was located toward the back of the property and in front of the detached garage. Though the picture below was taken approximately two months after the fire, the black trailer is the trailer open on the left:



8

Mr. Fitzpatrick signed a "voluntary consent to search" form authorizing Det. Delbusso "to conduct a complete search of" those locations. Exhibit A. While conducting the consent search, it appears law enforcement opened a small box in the black vehicle trailer to see what was inside and, in doing so, located 3 100-round boxes of TelAmmo ammunition. Though it is unknown exactly when these pictures were taken, the pictures below show the closed and open box containing the ammunition:




### 2.    Law Enforcement Exceeded The Scope Of Mr. Fitzpatrick's Consent In Searching A Box In The Trailer, Thereby Conducting An Invalid Search.

Mr. Fitzpatrick does not challenge whether his consent was generally voluntary. Mr. Fitzpatrick does, however, challenge the scope of the search.

The Constitution guarantees the right to be free from unreasonable searches or seizures. U.S. Const., amends IV, XIV. A warrantless search or seizure is *per se* unreasonable unless it comes within one of a few recognized and limited exceptions. *Coolidge v. New Hampshire*, 403 U.S. 443, 455 (1971). To establish the validity of a warrantless search or seizure, the burden is on the Government to prove by a preponderance of the evidence that it falls within an exception to the warrant requirement. *Id.*

Consent can be an exception to the Fourth Amendment's warrant requirement because it is

reasonable for police to conduct a search once they have permission to do so. *Schneckloth v. Bustamonte*, 412 U.S. 218, 219 (1973). Not surprisingly, therefore, "[t]he standard for measuring the scope of a suspect's consent under the Fourth Amendment is that of 'objective' reasonableness—what would the typical reasonable person have understood by the exchange between the officer and the suspect?" *Florida v. Jimeno*, 500 U.S. 248, 251 (1991); *United States v. Smith*, 395 F.3d 516, 519 (4th Cir. 2005).

Material to the inquiry about the scope of a consent search is the stated object of the search. *Jimeno*, 500 U.S. at 251 ("The scope of a search is generally defined by its expressed object."). Indeed, the reasonableness of the scope of the search depends on whether it is confined to the areas capable of concealing the objects of the search. *See, e.g.*, *Wyoming v. Houghton*, 526 U.S. 295, 307 (1999) (holding police officers "may inspect passengers' belongings found in the car that are capable of concealing the object of the search"); *United States v. Johns*, 469 U.S. 478, 487 (1985) (finding a search reasonable because "there is no plausible argument that the object of the search could not have been concealed in the packages"); *United States v. Ross*, 456 U.S. 798, 820 (1982) ("A lawful search of fixed premises generally extends to the entire area in which the object of the search may be found . . . ."); *see also id.* ("Thus, a warrant that authorizes an officer to search a home for illegal weapons also provides authority to open closets, chests, drawers, and containers in which the weapon might be found."); *Horton v. California*, 496 U.S. 128, 141 (1990) ("Police with a warrant for a rifle may search only places where rifles might be . . . ." (quoting *Coolidge*, 403 U.S. at 517 (White, J., concurring and dissenting))).

In *Jimeno*, for example, the defendant was pulled over in his vehicle for a traffic violation. 500 U.S. at 249. The officer told Jimeno that he suspected Jimeno was carrying narcotics, and then asked for permission to search the car. *Id.* Jimeno consented, and the officer discovered cocaine

inside of a folded, brown paper bag that had been placed on the floorboard of the vehicle. *Id.* at 249-50. The Supreme Court held that a reasonable objective person would have concluded that Jimeno's general consent included permission to search containers within the car that could conceivably contain drugs, such as the paper bag. *Id.* at 249-51.

Here, Mr. Fitzpatrick signed a voluntary consent to search form authorizing Det. Delbusso "to conduct a complete search of" certain locations. Exhibit A. The requested consent must have been limited to items that would be related to the fire, and specifically its cause and origin. Indeed, the property was being searched at the time *because* a fire destroyed Mr. Fitzpatrick's home, making it uninhabitable, and the cause was undetermined. Mr. Fitzpatrick consented to the search of, among other things, a black vehicle trailer that was located on the three-acre property away from the home for the purpose of locating items of value in determining the origin or cause of the fire.

From an objective reasonableness standard, Mr. Fitzpatrick never consented to a search of a small cardboard box in the trailer. No reasonable person would have reason to believe anything in the box would be of use in determining the cause or origin of the fire, particularly given the location and nature of the trailer. *E.g.*, *United States v. Rahman*, 805 F.3d 822 (7th Cir. 2015) (closed bank bags, receipts, and tray from cash register were illegally seized because although defendant gave consent to search restaurant to determine origin and cause of fire, basement had been ruled out as the origin of the fire); *Pitts v. District of Columbia*, 177 F. Supp. 3d 347, 374 (D.D.C. 2016) ("None of the MPD Officer Defendants could have reasonably believed that a man who was in the kitchen cooking dinner would or could have been secreting inside his anal cavity the kinds of evidence sought in the warrant—namely, 'illegal firearms, parts of firearms, firearm magazines, ammunition, holsters, gun cleaning kits, gun cases, pictures, papers or other

paraphernalia relating to the ownership of a firearm.'"); *United States v. Turner*, 169 F.3d 84, 87-89 (1st Cir. 1999) (defendant's consent to search apartment for evidence of intruder who broke into neighbor's apartment did not extend to computer files); *United States v. Dichiarinte*, 445 F.2d 126, 129-30 (7th Cir. 1971) (police officers who obtained consent to search in reference to narcotics could not inspect personal papers, as "government agents may not obtain consent to search on the representation that they intend to look only for certain specified items and subsequently use that consent as a license to conduct a general exploratory search").

Because Mr. Fitzpatrick's consent did not extend to a small cardboard box in the trailer, Mr. Fitzpatrick seeks suppression of the ammunition as well as suppression of any derivative evidence from this unlawful search.

**B.**  **Second, The Subsequent Warrant Affidavit To Search The Trailer And Seize The Ammunition Contained Material Omissions That Would Have Defeated Probable Cause.**

Following the discovery of the ammunition, Det. Delbusso authored an affidavit in support of a warrant to search the trailer for and to seize ammunition. Exhibit B. The warrant was issued based on probable cause to believe that Mr. Fitzpatrick committed the crime of illegal possession of ammunition under Maryland state law (Md. Code Ann., Public Safety § 5-133.1). Section 5-133.1(b) of the Public Safety Code prohibits possession of ammunition by individuals who have certain prior convictions. The statute prohibits knowing possession, *Howling v. State*, 274 A.3d 1124, 1139-40 (Md. App. Ct. 2022), and it requires that the person "either directly or inferentially . . . exercised some dominion or control over the" ammunition, *Parker v. State*, 402 Md. 372, 407 (2007). Possession may be actual or constructive and either exclusive or joint. *Id.*

On the first page of the affidavit, Det. Delbusso included his experience in law

enforcement. On the second page, he offered the following as probable cause that Mr. Fitzpatrick

committed the state crime of illegal possession of ammunition:

**The following circumstances are offered as probable cause:**
On March 10, 2017 at 2355 hours, Howard County 911 received multiple calls reporting a fire at
11910 Emerald Court, Ellicott City, Howard County, Maryland 21042. Responding firefighters
encountered a single family home fully engulfed in flames. The cause of the fire was undetermined.
The structure was destroyed and uninhabitable.

The owner of the property was identified as Michael Fitzpatrick. This information was verified
through Maryland Department of Assessments & Taxation (Real Property). Your Affiant Delbusso
interviewed Michael Fitzpatrick at the fire scene. Michael Fitzpatrick advised he is the current owner
of the Bravo Trailer / Maine Registration 20TLR98486 / VIN 542GJ4839EB007790 / black in color).
A Maine Registration plate (20TLR98486) is attached to the rear of the trailer. The vehicle
identification number has been identified as 542GJ4839EB007790. Both the Maine registration and
the vehicle identification number are confirmed registered to Michael Fitzpatrick (W/M DOB
7/14/1969 Address: 11910 Ellicott City, MD 21042). A Maryland Motor Vehicle Administration
check listed 11910 Ellicott City, MD 21042 as Michael Fitzpatrick's residence. Due to the extended
fire scene investigation, Michael Fitzpatrick signed a consent to search form. This consent form
authorized, Detective Delbusso, to search the Bravo Trailer / Maine Registration 20TLR98486 / VIN
542GJ4839EB007790 / black in color. During the search of the trailer, your Affiant Delbusso located
(3) boxes of TulAmmo (.223 remington). The three boxes of ammunition were stored in a cardboard
box. The box is labeled (Shipping label) to Michael Fitzpatrick 11910 Emerald Ct. Ellicott City, MD
21042. Your Affiant Delbusso verified with the Bureau of Alcohol, Tobacco and Firearms (ATF) that
Michael Fitzpatrick (W/M DOB 7/14/1969) is PROHIBITED from possessing firearms / ammunition
at this time. Your Affiant Delbusso verified with the Bureau of Alcohol, Tobacco and Firearms (ATF)
that Michael Fitzpatrick (W/M DOB 7/14/1969) is PROHIBITED from possessing firearms /
ammunition at this time (Convicted of Theft Scheme $500 Plus in The Circuit Court of Howard
County on 12/02/2003 Case#:13K03042873 / ATF confirmation Agent Nina Regert ID#1567 &
(Maryland State Police) TFC Brett Layman ID#5957). Your Affaint Delbusso confirmed the scene
(to include the Bravo Trailer / Maine Registration 20TLR98486 / VIN 542GJ4839EB007790 / black
in color) has been secured by the Howard County Police since the initiation of the fire scene.

Your affiant also believes the vehicle trailer will contain the TulAmmo .223 (Ammunition) observed
by your Affiant Delbusso on 3/12/2017. With this knowledge and basis for probable cause, your
Affiant, prays that a Search and Seizure Warrant be issued authorizing him, with the necessary and
proper assistance to:

A. Enter and search the property as completely described in this Application and Affidavit.
B. Seize all evidence and paraphernalia, used in, or incidental to the conduct of the aforementioned
crime(s).
Your Affiant avers that an intensive and detailed evaluation of the total circumstances as related above

The Fourth Amendment provides that "no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized." U.S. Const. amend. IV. A defendant may challenge the legality of a warrant on the basis that it was issued on an affidavit that contained a material omission. *United States v. Lull*, 824 F.3d 109, 114 (4th Cir. 2016). Where a defendant establishes that the affiant intentionally or recklessly omitted material information from the affidavit, the search warrant must be voided and the fruits of the search excluded. *Id.*

An omission is material if it is "necessary to the [neutral and disinterested magistrate's] finding of probable cause." *Franks v. Delaware*, 438 U.S. 154, 156 (1978). Even if relevant, information is not material unless "its inclusion in the affidavit would defeat probable cause." *See United States v. Colkley*, 899 F.2d 297, 301 (4th Cir. 1990). In assessing materiality, the court is asked to "insert the facts recklessly [or intentionally] omitted, and then determine whether or not the corrected warrant affidavit would establish probable cause. If the corrected warrant affidavit establishes probable cause," there is no *Franks* violation. *Miller v. Prince George's Cty.*, 475 F.3d 621, 628 (4th Cir. 2007) (internal quotation marks and citations omitted); *e.g.*, *Lull*, 824 F.3d at 111-13 (holding that law enforcement officer's reckless omission of facts from his affidavit that undermined the reliability of a confidential informant were material and required reversal of conviction); *United States v. Tate*, 524 F.3d 449, 451 (4th Cir. 2008) (holding that a defendant should have received a *Franks* hearing when he offered evidence that an affiant police officer failed to disclose his trespassing in searching defendant's trash to obtain evidence of criminal activity).

Here, there are material omissions from the warrant affidavit. Det. Delbusso stated in the affidavit that Mr. Fitzpatrick consented to the search of the trailer and that, during the search, Det.

Delbusso located ammunition. That is true, but what is notable is what is missing. Det. Delbusso omitted the following facts from the affidavit pertaining to what Mr. Fitzpatrick told law enforcement:

- When signing the consent forms, Mr. Fitzpatrick told law enforcement that there was a rifle stored in the trailer and that it belonged to Mr. Weizman.

- When signing the consent forms, Mr. Fitzpatrick advised that he and Mr. Weizman would sometimes go to the range and shoot the rifle.

- That when law enforcement executed the consent search, there was *in fact* a rifle located in the trailer, as Mr. Fitzpatrick had told them.

Moreover, the affidavit was not as clear as it could have been regarding the condition of the box containing the ammunition or the label on the box. Det. Delbusso wrote, "The three boxes of ammunition were stored in a cardboard box. The box is labeled (Shipping label) to Michael Fitzpatrick 11910 Emerald Ct…" The picture below helps put this in context:



*First*, the box was not in pristine condition. It had already been opened. Law enforcement had no way to know whether the contents of the box were the original contents of the box—*i.e.*, that whatever was originally shipped in the box was what the box contained when law enforcement discovered it—or whether the box originally contained something else and was just being used to store the ammunition. *Second*, the top of the box contained a shipping label noting the contents were "ship[ped] to" Mr. Fitzpatrick at his address. But the outside of the box indicates nothing about what was in the box originally (meaning what was shipped to Mr. Fitzpatrick) or the separate question of who owned the contents of the box.

Here, the affidavit contains material omissions and should have, but did not, include the important facts noted above. Inclusion of the omitted facts would have undermined probable cause to believe Mr. Fitzpatrick possessed the ammunition knowingly, and that he, *as opposed to someone else (specifically, Mr. Weizman),* possessed the ammunition.

Including the fact that Mr. Fitzpatrick volunteered to law enforcement that a rifle was in the trailer and belonged to Mr. Weizman would have suggested to the Judge that the ammunition, too, belonged to Mr. Weizman. Including that the rifle was in fact found in the trailer during the consent search would have bolstered Mr. Fitzpatrick's credibility. And including the fact that Mr. Fitzpatrick volunteered that the rifle was in the trailer would have left the Judge with the reasonable inference that Mr. Fitzpatrick did *not* know that ammunition was also in the trailer—for why would he have alerted law enforcement to the rifle but not to the ammunition?

The fact that Mr. Fitzpatrick's name was on the shipping label on this box would not have, alone, established Mr. Fitzpatrick's knowing possession of the ammunition. The picture above makes clear that the cardboard box with the shipping label had been opened at some point and then reclosed. The shipping label did not itself reveal the contents of the box. In other words, there was

16

no evidence that whatever was in the box the day Det. Delbusso opened it was the same item that was originally contained in the box. In other words, there was no evidence that Mr. Fitzpatrick's name on this box in any way established probable cause that he was in knowing possession of the ammunition that was found to be in the box on March 12, 2017.

The omission of information from Mr. Weizman may create a *Franks* issue as well. The same day Det. Delbusso applied for the warrant, SA Jeppi and ATF Task Force Officer Dexter Hodges interviewed Mr. Weizman about the firearm and ammunition from the trailer. Exhibit C. In his interview and statement, Mr. Weizman: (1) confirmed the firearm belonged to him, (2) stated he built the firearm at Mr. Fitzpatrick's home when he was not present, (3) said the ammunition was "purchased by Mike," (4) claimed they had a deal where Mr. Fitzpatrick could shoot the firearm if he purchased ammunition, and (5) reported they shot targets together in Virginia. *Id.* The warrant was issued at or around 5:37 p.m. Exhibit B at p.2. Mr. Weizman was interviewed earlier that morning. It is unclear whether and when the information learned from Mr. Weizman was conveyed to Det. Delbusso.

If Det. Delbusso was aware of the information gathered from Mr. Weizman and left it out of the affidavit, those omissions are material. Like the information Mr. Fitzpatrick reported that was not included in the affidavit, this information would have defeated probable cause. This information likewise indicated Mr. Weizman – not Mr. Fitzpatrick – possessed the firearm and ammunition. And it further suggested that, even if at some point Mr. Fitzpatrick "possessed" the ammunition (while shooting), the possession happened in Virginia, not Maryland, and could not serve as probable cause for a weapons violation in Maryland.

Accordingly, Mr. Fitzpatrick requests a *Franks* hearing on this issue and suppression of the ammunition as well as any evidence that is derivative of the constitutional violation.

II.     **The Court Should Suppress Mr. Fitzpatrick's Black Tower Computer Because Its Warrantless Seizure From Linda Rabinovich On March 14, 2017 Was Constitutionally Improper.**

As discussed above, valid consent is an exception to the requirement that law enforcement have a warrant to seize or search evidence. The Defense assumes the Government will rely on the consent exception to the warrant requirement to argue that Ms. Rabinovich, Mr. Fitzpatrick's then-significant other, consented to the seizure of a black tower computer that was seized on March 14, 2017.

On March 13, 2017, Ms. Rabinovich, who had been in a relationship with Mr. Fitzpatrick for approximately 1.5 years at the time, contacted Howard County law enforcement about items belonging to Mr. Fitzpatrick that concerned her. She had been cleaning out a closet she did not regularly use and located Mr. Fitzpatrick's clothing, which surprised her, and then looked around an office where Mr. Fitzpatrick, who had been recovering from foot surgery, had set up his work computer, and located financial and other information that concerned her.

On March 14, 2017, Howard County Police Department detectives and SA Jeppi responded to Ms. Rabinovich's residence at her request. Discovery indicates that Ms. Rabinovich signed a consent to search her residence[4] and directed detectives to the location of items and requested that they be removed from her residence. Several of Mr. Fitzpatrick's belongings were seized at this time, including a black tower computer. It is the Defense's understanding that the computer was seized before Mr. Fitzpatrick was arrested that same day in front of Ms. Rabinovich's house.

Consent for a search must be given voluntarily, *Bumper v. North Carolina*, 391 U.S. 543,

---

[4] The Defense appreciates the Government's willingness to work together on providing discovery and looks forward to receiving this consent to search form. Because the Defense is not currently in possession of this form, the Defense reserves the right to argue separately that the consent to search was not voluntary.

548 (1968), and the individual giving consent must also possess the authority to do so, either actual or apparent, *Illinois v. Rodriguez*, 497 U.S. 177, 181 (1990). Moreover, "the consent of one who possesses common authority over premises or effects is valid as against the absent, nonconstant person with whom that authority is shared." *United States v. Matlock*, 415 U.S. 164, 170 (1974). Common authority rests not on property rights but "rather on mutual use of the property by persons generally having joint access or control . . . so that it is reasonable to recognize that any of the co-inhabitants has the right to permit the inspection in his own right and that the others have assumed the risk that one of their number might permit the common area to be searched." *Id.* at 171 n.7.

There are, however, limits on a third party's ability to consent to a search. It is not always an absolute. As the Fourth Circuit explained in *United States v. Block*, 590 F.2d 535 (4th Cir. 1978),

> [I]t is equally well settled that third person consent, no matter how voluntarily and unambiguously given, cannot validate a warrantless search when the circumstances provide no basis for a reasonable belief that shared or exclusive authority to permit inspection exists in the third person from any source, *Stoner v. California*, 376 U.S. at 489; nor even more certainly, when the circumstances manifest to the contrary that the absent target of the search retains an expectation of privacy in the place or object notwithstanding some appearance or claim of authority by the third person, *Reeves v. Warden*, 346 F.2d 915 (4th Cir. 1965); *United States ex rel. Cabey v. Mazurkiewicz*, 431 F.2d 839 (3d Cir. 1970); nor, still more certainly, when the retained expectation of privacy is manifest in the circumstances and the third person actually disclaims any right of access, *United States v. Wilson*, 536 F.2d 883 (9th Cir. 1976).

*Id.* at 540. In other words, third-person consent to a search is not valid when the third person doesn't actually have authority to consent, or when the target of the search retained an expectation of privacy in his belongings notwithstanding some claim of authority by the third person, or when the third person disclaims any right of access.

There is also an important difference between when a third party may have the authority to consent to a *search* compared to when a third party may have the authority to consent to a *seizure*. In other words, even where a third party has the authority to consent to a search, the capacity to

consent to a *seizure* of an object in the premises does not always follow. *E.g.*, *State v. Lacey*, 349 Mont. 371, 387-90 (2009); *People v. Blair*, 321 Ill. App. 3d 373, 376-81 (2001).

In *Blair*, for example, the Appellate Court of Illinois held that the consent of a defendant's father to a warrantless seizure of the defendant's computer was ineffective. The court reasoned that "the rationale for third-party consent searches resting, as it does, upon the diminished expectation of privacy attending a third party's common authority over the premises or effects to be searched, does not provide a sufficient basis for a third party's consent to the seizure of another's personal effects." 321 Ill. App. 3d at 879. The court explained that "[w]hile one who permits a third party access or control over his property has a diminished expectation of privacy, the third party's access or control does not similarly diminish the owner's expectation that he will retain possession of the property." *Id.* Therefore, "the consent of [the] third party [was] ineffective to permit the government to seize property in which the third party has no actual or apparent ownership interest." *Id.* at 380. Likewise, in *Lacey*, the Montana Supreme Court applied the same principles in holding that a defendant's live-in girlfriend did not have the right or authority to consent to the seizure of the defendant's computer. 349 Mont. at 389.

Here, Ms. Rabinovich did not have authority to consent to *seizure* of Mr. Fitzpatrick's black tower computer. The computer was unquestionably Mr. Fitzpatrick's, it was his alone, it had been in a location Ms. Rabinovich had given him approval to be in, and at the time it was seized (before his arrest), Mr. Fitzpatrick still had an immediate possessory interest in it. For this reason, the black tower computer should be suppressed, as well as any derivative evidence obtained from its unlawful seizure.

III.    **The Court Should Suppress Mr. Fitzpatrick's Black Tower Computer For The Further Reason That It Was The Subject Of An Improperly Extended Seizure.**

The Court should suppress Mr. Fitzpatrick's black tower computer for the further reason that it was the subject of an unreasonably extended seizure. From the discovery, the Defense understands the following: On March 14, 2017, the black tower computer was seized from Ms. Rabinovich. On March 23, 2017, Det. Delbusso applied for a state warrant to search this computer, among other devices, and seize evidence related to arson and insurance fraud. Exhibit D. It does not appear that warrant was ever executed on the black tower computer, and it sat in an evidence vault. Approximately eight months later – on November 20, 2017 – SA Jeppi applied for a federal warrant to search the black tower computer, among other devices and objects, and seize evidence related to arson, fraud, and illegal possession of ammunition. Exhibit E.[5] SA Jeppi's warrant application noted that the computer had been seized by law enforcement on March 14 and was in the custody of the ATF in Baltimore. *Id.* at p. 3. SA Jeppi's affidavit stated that the black tower computer, among other seized items from March 14, was "secured at the Howard County Police Station and/or the ATF Evidence Vault in preparation for a search and seizure warrant." *Id.* at p. 31 (¶ 18). SA Jeppi's affidavit does not mention that the black tower computer had ever been searched prior to November 20, 2017. On November 29, 2017, a forensic imaging expert received the computer from SA Jeppi and processed that computer, along with two others, from that date through January 5, 2018.

A seizure that is "lawful at its inception can nevertheless violate the Fourth Amendment because its manner of execution unreasonably infringes possessory interests protected by the

---

[5] For ease of reference, the Defense has added page numbers to the bottom right-hand section of Exhibits E, F, and G, which are each federal warrant applications. The citations are to the page numbers the Defense has added.

Fourth Amendment's prohibition on 'unreasonable seizures.'" *United States v. Jacobsen*, 466 U.S. 109, 134 (1984). To determine whether an extended seizure violates the Fourth Amendment, the court must "balance the government's interest in the seizure against the individual's possessory interest in the object seized." *United States v. Pratt*, 915 F.3d 266, 271 (4th Cir. 2019) (citing *United States v. Place*, 462 U.S. 696, 703 (1983); *United States v. Van Leeuwen*, 397 U.S. 249, 252-53 (1970)). A "strong government interest can justify an extended seizure," but "if the individual's interest outweighs the government's, an extended seizure may be unreasonable." *Id.*

Here, Mr. Fitzpatrick had a significant possessory interest in his computer. *United States v. Mitchell*, 565 F.3d 1347, 1351 (11th Cir. 2009) ("Computers are relied upon heavily for personal and business use. Individuals may store personal letters, e-mails, financial information, passwords, family photos, and countless other items of a personal nature in electronic form on their computer hard drives."). Discovery indicates that this computer contained the essentials of Mr. Fitzpatrick's life, both personal and professional. The computer contained Mr. Fitzpatrick's emails (among other things) about insurance, legal representation, and electronic payment information; evidence of Mr. Fitzpatrick's use of the Internet for personal and business reasons; documents pertaining to his divorce and his business; and personal photos, including of his family. Indeed, it is exactly because it contains these essentials of life, that it has evidentiary interest for the federal prosecution team in this case and, presumably but surely, the state prosecution team in Mr. Fitzpatrick's pending state trial on arson and fraud charges.

The seizure in this case was lengthy. *United States v. Burgard*, 675 F.3d 1029, 1033 (7th Cir. 2012) ("The longer the police take to seek a warrant, the greater the infringement on the person's possessory interest will be, for the obvious reason that a longer seizure is a greater infringement on possession than a shorter one."). Despite a state search warrant authorizing its

search on March 23, 2017, *see* Exhibit D, it appears the computer was not actually searched until late November 2017 through early January 2018—a period of nearly 8-10 months. And that search was completed only after a *second* search warrant was issued authorizing its search. *See* Exhibit E.

Mr. Fitzpatrick did not diminish his possessory interest in the computer. He did not consent to its seizure or voluntarily share its contents. *Pratt*, 915 F.3d at 271-72 ("An individual diminishes his interest where he consents to a search or voluntarily shares the seized object's contents."); *Burgard*, 675 F.3d at 1034 (finding defendant "had a strong interest in possessing his cell phone" as "[a]t no point before the seizure did he abandon the phone or relinquish it to a third party"). Nor did Mr. Fitzpatrick have the opportunity to take critical information from the computer prior to its seizure. *United States v. Laist*, 702 F.3d 608, 616 (11th Cir. 2012) (considering in weighing the infringement on the defendant's possessory interests the fact that he "was afforded the opportunity to remove 'whatever he wanted to download' from the computer and hard drives , and, notably, . . . did in fact remove files he needed for school"). And he was only briefly detained after the computer was seized. *Compare United States v. Sullivan*, 797 F.3d 623, 633 (9th Cir. 2015) ("Where individuals are incarcerated and cannot make use of seized property, their possessory interest in that property is reduced."). When he was released, Mr. Fitzpatrick continued to try to live his life, including his employment in snow removal and landscaping, without the benefit of his computer.

On the other side, while law enforcement had an interest in its contents for evidentiary reasons, law enforcement had plenty of time and plenty of resources to forensically image the computer. *See Pratt*, 915 F.3d at 272 (31-day delay in obtaining a warrant resulted in an extended seizure of a defendant's phone); *Mitchell*, 565 F.3d at 1351-53 (21-day failure to obtain a search

warrant for a seized computer was unreasonable). Indeed, after the November federal warrant was issued, it took a computer forensic expert (over the holiday season) only five weeks (11/29/17 to 1/5/18) to forensically image this computer and two other computers. Law enforcement could have – but did not – forensically image the computer soon after it was seized and then return it to Mr. Fitzpatrick. *See Pratt*, 915 F.3d at 273 ("The agents could have removed or copied incriminating files and returned the phone.").

For these reasons, the black tower computer, as well as any derivative evidence, should be suppressed.[6]

## IV.    The Court Should Suppress Evidence Obtained From The Warrantless Seizure Of Mr. Fitzpatrick's Cell Phone On March 14, 2017.

On March 14, 2017, Mr. Fitzpatrick was arrested in front of Ms. Rabinovich's residence for illegal possession of a regulated firearm and ammunition. At some point during the arrest, law enforcement seized a Verizon Galaxy S7 smartphone from Mr. Fitzpatrick's person. It is the Defense's understanding the phone was seized without a warrant and that the Government will argue it was seized incident to arrest. Following a proffer of the factual circumstances surrounding the seizure of the cell phone, the Defense may abandon this challenge.

The search incident to arrest exception to the warrant requirement "provides that when law enforcement officers have probable cause to make a lawful custodial arrest, they may—incident to that arrest and without a warrant—search the arrestee's person and the area within his immediate control." *United States v. Currence*, 446 F.3d 554, 556 (4th Cir. 2006) (quoting *Chimel v.*

---

[6] It appears that the Verizon Galaxy S7 (seized on March 14, 2017) and the Samsung Galaxy S8 (seized on May 19, 2017) were searched prior to the application for the November 20 warrant. It is the Defense's understanding that the Verizon Galaxy S7, which was also the subject of the March 23, 2017 warrant, was processed between April 4 and May 31, 2017. Given the number of devices that had to be processed, counsel is not arguing there was an extended seizure as it pertains to the Verizon Galaxy S7. It appears the Samsung Galaxy S8 was searched the same day it was seized.

*California*, 395 U.S. 752, 763 (1969)). "Such searches have long been considered valid because of the need 'to remove any weapons that the arrestee might seek to use in order to resist arrest or effect his escape' and the need to prevent the concealment or destruction of evidence." *New York v. Belton*, 453 U.S. 454, 457 (1981) (brackets omitted) (quoting *Chimel*, 395 U.S. at 763). The Fourth Circuit has assumed, without holding, that "when the conditions for a proper search incident to arrest arise, officers may secure cellphones with probable evidentiary value to prevent their destruction." *United States v. Horsley*, 105 F.4th 193, 208 n.7 (4th Cir. 2024) (citing *Riley v. California*, 573 U.S. 373, 388 (2014)).

Noting the two justifications for search incident to arrest – securing dangerous weapons and preventing the concealment or destruction of evidence – the Supreme Court has held, "If there is no possibility that an arrestee could reach into the area that law enforcement officers seek to search, both justifications for the search-incident-to-arrest exception are absent and the rule does not apply." *Arizona v. Gant*, 556 U.S. 332, 339 (2009). The Fourth Circuit has extended this reasoning from its original context, the search of an automobile, to searches of items not contained in an automobile, but nevertheless out of an arrestee's reach. *United States v. Davis*, 997 F.3d 191, 197 (4th Cir. 2021) ("[W]e see no reason to limit the first *Gant* holding—the one derived from *Chimel*—to searches of vehicles.").

Thus, law enforcement can conduct warrantless searches and seizures "of non-vehicular containers incident to a lawful arrest 'only when the arrestee is unsecured and within reaching distance of the [container] at the time of the search.'" *Id.* (quoting *Gant*, 556 U.S. at 343). The relevant question is whether it is reasonable for police to believe a defendant "could have accessed [an item] at the time of the search." *Id.* (quoting *Gant*, 556 U.S. at 344). In a recent case, the Fourth Circuit held that the district court clearly erred in ruling that a cell phone was properly seized

25

incident to arrest when the defendant was standing with his hands cuffed behind his back on the opposite side of a queen-sized bed from the table where the phone was lying and there were several U.S. marshals in the hotel room with him. *Horsley*, 105 F.4th at 209-10.

Here, the cell phone had no probable evidentiary value to the charged offenses (illegal possession of a rifle and ammunition), and based on discovery to date, it is unclear whether the conditions necessary for a valid search incident to arrest were met. As with all warrantless searches and seizures, it is the Government's burden to prove the constitutionality of the seizure of this cell phone.

V.      **Motion To Suppress The Contents Of Mr. Fitzpatrick's Samsung Galaxy S8, Which Was Seized On May 19, 2017, Both As A Violation Of Mr. Fitzpatrick's Sixth Amendment And Due Process Rights.**

A.      **Background To The Execution Of The May 19 Warrants.**

On May 19, 2017 at approximately 6:00 a.m., ATF Special Agents and Task Force Officers, investigators with the Howard County Police Department, Office of the Fire Marshal, and members of the Howard County Police Department Emergency Services Team executed search warrants at the residence of Mr. Fitzpatrick (then an apartment in Columbia, Maryland), on two cars at the residence, on the person of Mr. Fitzpatrick, and at the 11910 Emerald Court residence (which had been largely destroyed by the fire two months earlier). Exhibit F.

According to an ATF Report of Investigation (ROI), Mr. Fitzpatrick was located inside the Columbia apartment that morning and was handcuffed and placed on a stool in the kitchen. When law enforcement explained they had a warrant, Mr. Fitzpatrick advised that he would be cooperative and compliantly sat on the living room couch. At his request, the handcuffs were placed in front of him, and his small dog was allowed to stay with him on the couch.

The ROI states:

> SA Jeppi located a cell phone on the nightstand of the master bedroom. Shortly after the time of entry, the phone rang and the individual calling was Jonathan Weizman. (Investigator's Note: At the same time this search warrant was executed, a search warrant was also executed at 11910 Emerald Court). SA Jeppi advised FITZPATRICK that she did not have intentions to take his cellular phone; however, she needed the password to access the phone so that she could review some of the data. FITZPATRICK advised SA Jeppi that he wished to cooperate, and provided the password to the phone.

The search warrants attached as Exhibit D do not anywhere require Mr. Fitzpatrick to provide his password to law enforcement.

At the scene, the cell phone (a Samsung Galaxy S8) was given to an ATF Digital Media Expert who searched it for information authorized by the warrant. The ROI reports that this preliminary search indicated the phone contained "valuable" information and, after consultation with the prosecutor, investigators determined the phone should be seized pursuant to the warrant and returned later. When SA Jeppi told Mr. Fitzpatrick this information, the ROI notes that he became "agitated and stated that the phone contains information he needs for work." SA Jeppi reportedly told him that she would call Mr. Weizman that afternoon and arrange for a transfer of the phone. When the warrant had been fully executed, SA Jeppi explained to Mr. Fitzpatrick the items that were seized. SA Jeppi told Mr. Fitzpatrick "that she knew he was represented, but if he wished to talk to her about the fire and incidents surrounding the fire to advise her of such."

At the time SA Jeppi obtained Mr. Fitzpatrick's password from him, Mr. Fitzpatrick was represented by counsel. On March 14, 2017, Mr. Fitzpatrick was arrested on state charges of illegal possession of a regulated firearm and ammunition. Mr. Fitzpatrick was represented in that case by lawyer Joseph Murtha. As of May 19, 2017 – when the warrant was executed and Mr. Fitzpatrick gave his password to SA Jeppi – he was represented, a fact that SA Jeppi acknowledged she knew.

It was not until on or about October 2, 2017, that those state charges were placed on the stet docket.[7]

## B.    Mr. Fitzpatrick Moves To Suppress His Statement Providing His Password To SA Jeppi And Any Derivative Evidence, Including The Contents Of The Phone As A Violation Of His Sixth Amendment Rights.

The Sixth Amendment provides that an "accused shall . . . have the assistance of counsel for his defense." U.S. Const. amend. VI. The right to counsel is triggered "at or after the time that judicial proceedings have been initiated," *Fellers v. United States*, 540 U.S. 519, 523 (2004) (quoting *Brewer v. Williams*, 430 U.S. 387, 398 (1977)), and applies at all "critical stages" of the criminal proceedings, *Montejo v. Louisiana*, 556 U.S. 778, 786 (2009). "[A]n accused is denied the basic protections of the Sixth Amendment when there is used against him at his trial evidence of his own incriminating words, which federal agents . . . deliberately elicited from him after he had been indicted and in the absence of his counsel." *Id.* (quoting *Massiah v. United States*, 377 U.S. 201, 206 (1964)) (brackets omitted). Sixth Amendment protections apply not just where there is explicit questioning, but also where law enforcement "takes some action . . . that was designed deliberately to elicit incriminating remarks." *See Kuhlmann v. Wilson*, 477 U.S. 436, 459 (1986) ("[B]ecause of the relationship between the defendant and the informant, the informant's engaging the defendant 'in active conversation about their upcoming trial was certain to elicit' incriminating statements from the defendant. Thus the informant's participation in this conversation was the functional equivalent of interrogation." (internal quotation marks omitted)).

Here, Mr. Fitzpatrick had a Sixth Amendment right to counsel. When this warrant was executed (May 19, 2017), he was actively represented by an attorney on pending state illegal

---

[7] Defense counsel is working on obtaining documents to confirm this date. There has been difficulty obtaining documentation given a recent change in Maryland state law that automatically purges certain case records.

possession of a regulated firearm and ammunition charges. When agents executed the warrant that day on multiple locations, it was because SA Jeppi was investigating not only federal arson and fraud related offenses, but also illegal firearms and ammunition possession charges.

SA Jeppi deliberately elicited information from Mr. Fitzpatrick. As he was handcuffed and placed on a stool in his kitchen, SA Jeppi identified herself and advised him that law enforcement was there to execute a search warrant for his apartment and vehicle. At some point during the encounter, SA Jeppi saw Mr. Fitzpatrick's phone ringing, brought the phone to him, and elicited from him the password to his phone. *E.g.*, *United States v. Maffei*, No. 18-cr-00174-YGR-1, 2019 WL 1864712, at *9-10 (N.D. Cal. Apr. 25, 2019) (agent "stating 'that he was there to get the passcode for the phones'" after the defendant had invoked her right to counsel resulted in a Sixth Amendment violation). The ATF ROI notes that SA Jeppi advised Mr. Fitzpatrick that she "needed" the password to the phone to review some data but did not have intentions to take his cell phone.

Mr. Fitzpatrick did not waive his Sixth Amendment right to counsel. While an accused can waive the Sixth Amendment right to counsel and allow post-indictment questioning in the absence of counsel, that generally requires law enforcement to provide *Miranda* warnings. *Patterson v. Illinois*, 487 U.S. 285, 296 (1988) ("As a general matter, then, an accused who is admonished with the warnings prescribed by this Court in *Miranda*, 384 U.S. at 479, has been sufficiently apprised of the nature of his Sixth Amendment rights, and of the consequences of abandoning those rights, so that his waiver on this basis will be considered a knowing and intelligent one."); *United States v. Muca*, 945 F.2d 88, 91 (4th Cir. 1991) (holding that a defendant validly waived his Sixth Amendment right to counsel with a knowing and intelligent *Miranda* waiver); *see also Montejo v. Louisiana*, 556 U.S. 778, 795 (2009) ("Since the right under both sources [the Fifth Amendment

right to counsel and the Sixth Amendment right to counsel] is waived using the same procedure, doctrines ensuring voluntariness of the Fifth Amendment waiver simultaneously ensure the voluntariness of the Sixth Amendment waiver." (citation omitted)).

Here, there is no indication in discovery that SA Jeppi provided Mr. Fitzpatrick his *Miranda* warnings. Instead, the discovery indicates SA Jeppi told Mr. Fitzpatrick after having completed execution of the warrant that "she knew he was represented, but if he wished to talk to her about the fire and incidents surrounding the fire to advise her of such." As such, Mr. Fitzpatrick did not knowingly and voluntarily waive his Sixth Amendment right to counsel, and his statement providing the password to SA Jeppi should be suppressed.

In addition, the contents of the phone should be suppressed. The fruit of the poisonous tree doctrine generally requires not only the suppression of the illegally obtained evidence itself, but also evidence that was derived from the primary evidence or the indirect product or "fruit" of the unlawful police conduct. *Nix v. Williams*, 467 U.S. 431, 441 (1984) (citing *Silverthorne Lumber Co. v. United States*, 251 U.S. 385 (1920); *Wong Sun v. United States*, 371 U.S. 471 (1963)). That doctrine applies to Sixth Amendment violations. *Id.* at 442 (citing *United States v. Wade*, 388 U.S. 218 (1967)). For this reason, the Court should suppress Mr. Fitzpatrick's statement providing the password and the phone's contents. *E.g.*, *Maffei*, 2019 WL 1864712, at *10 (suppressing defendant's "statement regarding the passcode to her cellphone, the resulting search of her phone, and all evidence subsequently derived from that search").

### C.    <u>Mr. Fitzpatrick Requests A Hearing To Challenge The Voluntariness Of His Statement Providing The Password To Law Enforcement.</u>

The Due Process Clause requires that, to be used at trial, a defendant's statement must be voluntary. The "test for determining whether a statement is involuntary under the Due Process Clause is whether the defendant's will has been overborne or his capacity for self-determination

critically impaired." *United States v. Cristobal*, 293 F.3d 134, 140 (4th Cir. 2002) (internal quotation marks omitted). A statement is involuntary where it is not the product of the defendant's own free will but is instead the product of improper police coercion. *See Colorado v. Connelly*, 479 U.S. 157, 170 (1986).

Improper police coercion is not just physical. *Blackburn v. Alabama*, 361 U.S. 199, 206 (1960) ("[T]his Court has recognized that coercion can be mental as well as physical . . ."). Improper police coercion can include threats, implied promises, trickery or deceit, and the use of other improper influences on a suspect. *See Arizona v. Fulminante*, 499 U.S. 279, 287-88 (1991) ("a credible threat is sufficient"); *United States v. Pelton*, 835 F.2d 1067, 1071, 1073-74 (4th Cir. 1987). Improper police coercion can even include economic coercion, like threatening to indefinitely retain a person's possessions if he refuses to speak. *United States v. Giddins*, 858 F.3d 870, 881-83 (4th Cir. 2017) (a car).

To determine whether a defendant's will has been overborne or his capacity for self-determination critically impaired, courts must consider the "totality of the circumstances, including the characteristics of the defendant, the setting of the interview, and details of the interrogation." *Pelton*, 835 F.2d at 1071 (quoting *United States v. Wertz*, 625 F.2d 1128, 1134 (4th Cir. 1980)). Where a statement is coerced, and thus involuntary, the statement and any evidence derived from the statement must be suppressed. *United States v. Patane*, 542 U.S. 630, 640 (2004) ("We have repeatedly explained 'that those subjected to coercive police interrogations have an *automatic* protection from the use of their involuntary statements (or evidence derived from their statements) in any subsequent criminal trial.'").

Here, Mr. Fitzpatrick is entitled to a hearing regarding the voluntariness of his provision of the phone password to SA Jeppi. *See United States v. Inman*, 352 F.2d 954 (4th Cir. 1965); *see also*

18 U.S.C. § 3501(a) ("In any criminal prosecution brought by the United States . . . a confession, as defined in subsection (e) hereof, shall be admissible in evidence if it is voluntarily given. Before such confession is received in evidence, the trial judge shall, out of the presence of the jury, determine any issue as to voluntariness."). At the hearing, it is the Government who bears the burden of establishing by a preponderance of the evidence that the statement was voluntary. *Giddins*, 858 F.3d at 881. Given that the warrants being executed that day did not require Mr. Fitzpatrick to provide his phone password to law enforcement, and that SA Jeppi "advised Fitzpatrick that she did not have intentions to take his cellular phone; however she needed the password to access the phone so that she could review some of the data," there is a real question as to whether Mr. Fitzpatrick's provision of the password was voluntary.

## VI.    Motion To Suppress Evidence From Google That Was Obtained From An Invalid Warrant.

### A.    Background On The Warrant.

On September 25, 2018, SA Jeppi applied for a warrant to search information in the Google account associated with mike.rmf@gmail.com and seize, among other things, the contents of all emails, all internet search data, and pictures that are evidence, fruits, and instrumentalities of arson, fraud, and illegal possession of firearms and/or ammunition. Exhibit G. The affidavit in support of the warrant includes factual allegations derived from statements made by Mr. Fitzpatrick and others during the course of the investigation conducted by Howard County and the ATF, as well as an overview of evidence obtained as of the date of the application.

The affidavit contains almost no mention of the specific email account mike.rmf@gmail.com. In paragraph 32 (of 75 total paragraphs), the affidavit mentions that Mr. Fitzpatrick's Nest user account and profile included the email address mike.rmf@gmail.com. *Id.* at p. 46-47. It further notes that the Nest thermostat and smoke alarm system produced an infrared

motion detector several hours before the fire. *Id.* In paragraph 55, the affidavit mentions that Mr. Fitzpatrick used the mike.rmf@gmail.com address in an email to an insurance agent/representative in May 2017 to add a car to his insurance policy. *Id.* at p. 58. In paragraph 61, the affidavit notes that an invoice for the purchase of two firearm upper receivers that was located on one of Mr. Fitzpatrick's electronic devices that was seized and analyzed included an email address of mike.rmf@gmail.com. *Id.* at p. 60-61.

**B.     The Fourth Amendment Requires A Nexus Between The Item To Be Searched And Specified Criminal Activity.**

"The Fourth Amendment protects individuals from 'unreasonable searches and seizures,' and provides that 'no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.'" *United States v. Drummond*, 925 F.3d 681, 686 (4th Cir. 2019), *abrogated on other grounds as recognized by United States v. Canada*, 103 F.4th 257 (4th Cir. 2024). "Probable cause determinations require a practical, common-sense decision, based on sworn facts, whether there is a fair probability that contraband or evidence of a crime will be found in a particular place." *United States v. Lyles*, 910 F.3d 787, 791 (4th Cir. 2018) (quoting *Illinois v. Gates*, 462 U.S. 213, 218 (1983)).

Probable cause is both *location-specific* and *crime-specific*: a magistrate may not approve a warrant unless she has "a substantial basis for concluding that probable cause exist[s] to search a *particular place* for evidence of a *specific crime*." *United States v. Jones*, 952 F.3d 153, 158 (4th Cir. 2020) (emphasis added). Put differently, "[r]egardless of whether an individual is validly suspected of committing a crime, an application for a search warrant concerning his property or possessions must demonstrate cause to believe that evidence is likely to be found at the place to be searched" and there must be a "nexus . . . between the item to be seized and criminal behavior."

33

*United States v. Griffith*, 867 F.3d 1265, 1271 (D.C. Cir. 2017) (quoting *Groh v. Ramirez*, 540 U.S. 551, 568 (2004); *Warden, Md. Penitentiary v. Hayden*, 387 U.S. 294, 307 (1967)); *Burns v. United States*, 235 A.3d 758, 771 (D.C. 2020) ("The affidavit thus must demonstrate cause to believe not only that an item of evidence is likely to be found at the place to be searched, but also that there is a nexus between the item to be seized and the criminal behavior under investigation." (quoting *Griffith*, 867 F.3d at 1271) (brackets omitted)).

The determination of whether probable cause exists is based on the facts set forth in the four corners of law enforcement's sworn affidavit, and "[w]holly conclusory statements . . . ordinarily will not suffice." *United States v. Villapando*, No. ELH-16-159, 2017 WL 1277491, at *11 (D. Md. Apr. 5, 2017) (citing *Owens v. Lott*, 372 F.3d 267, 277 (4th Cir. 2004); *Gates*, 462 U.S. at 239)).

There are a wealth of cases, both in the Fourth Circuit and outside the Fourth Circuit, and both in cases involving searches of cell phones and other locations and items, that demonstrate the fundamental tenet that an application for a search warrant must demonstrate probable cause to believe that evidence is likely to be found at the place to be searched *and* that a nexus must exist between the item to be seized and the specific criminal behavior under investigation.

Take, for example, *United States v. Lalor*, 996 F.2d 1578 (4th Cir. 1993), a Fourth Circuit case involving a defendant's residence. There, the Fourth Circuit held a warrant invalid due to a lack of nexus to alleged drug activity in the defendant's residence. The warrant to search the residence in that case was based on information from two confidential informants who told police that the defendant was selling drugs on certain streets near his residence. *Id.* at 1579-80. The Fourth Circuit explained that the affidavit did not "describe circumstances that indicate such evidence [of drug activity] was likely to be stored at [the defendant's] residence." *Id.* at 1582. And because there

34

was no "information link[ing] the criminal activity to the defendant's residence," the Fourth Circuit held that the warrant was defective. *Id.* at 1583; *see also, e.g.*, *id.* ("[R]esidential searches have been upheld only where some information links the criminal activity to the defendant's residence."); *United States v. McPhearson*, 469 F.3d 518, 524-25 (6th Cir. 2006) (warrant defective because the affidavit did not "support the inference that evidence of wrongdoing would be found in [the defendant's] home because drugs were found on his person"); *United States v. Brown*, 828 F.3d 375, 382-85 (6th Cir. 2016) (warrant defective because the supporting affidavit "contained no evidence that [the defendant] distributed narcotics from his home, that he used it to store narcotics, or that any suspicious activity had taken place there"); *United States v. Brown*, 567 F. App'x 272, 281-84 & n.7 (5th Cir. 2014) (affidavit contained "no" evidence linking the defendant's drug trafficking to his home, only a bare statement that officers "believed" that drugs were located there); *United States v. Powers*, 1 F. Supp. 3d 470, 474-75 (M.D.N.C. 2014) ("There are no facts connecting the residence to evidence related to a robbery, and there is no probable cause to search the residence for evidence related to the robbery.").

Take, as another example, *United States v. Doyle*, 650 F.3d 460 (4th Cir. 2011), a separate Fourth Circuit case involving a search of a defendant's residence. There, the Fourth Circuit held that probable cause did not exist to justify a search of the home for child pornography, even though the search warrant affidavit presented evidence of child molestation and possession of nude images of children. The Fourth Circuit explained, "There is, however, remarkably scant evidence in the affidavit (or Rouse's investigation summary) to support a belief that Doyle in fact possessed child pornography. The bulk of the information supplied in the affidavit concerned allegations of sexual assault. But evidence of child molestation alone does not support probable cause to search for child pornography." *Id.* at 472.

In the context of cell phones, *United States v. Lyles*, 910 F.3d 787, 795 (4th Cir. 2018), another Fourth Circuit case, also illustrates the blackletter law that a search warrant application must demonstrate probable cause to believe evidence is likely to be found at the place to be searched *and* that there must be a nexus between the item to be seized and the specific criminal behavior under investigation. In *Lyles*, the Fourth Circuit held that a warrant was overbroad where it permitted the search and seizure of any cell phones in a home based chiefly on finding three marijuana stems in the trash. Astounded at the "lack[ of] any nexus between cell phones and marijuana possession" in the warrant application, the Fourth Circuit explained, "There is insufficient reason to believe that any cell phone in the home, no matter who owns it, will reveal evidence pertinent to marijuana possession simply because three marijuana stems were found in a nearby trash bag. At some point an inference becomes, in Fourth Amendment terms, an improbable leap." *Id.*

Other cases outside the Fourth Circuit applying the fundamental tenet in the context of cell phone searches reach the same conclusions. Like the Fourth Circuit in *Lyles*, the D.C. Court of Appeals in *Burns v. United States*, 235 A.3d 758 (D.C. 2020), held that it was insufficient for law enforcement to assert their "belief" that there was probable cause that evidence related to a homicide would be found on the defendant's cell phones – specifically in the phones' subscriber and owner information, call logs, contact lists, voice mail, and text messages, videos, photographs, and tweets. 235 A.3d at 774. The court held that general unsupported assertions in the affidavit that allowed police to search for broad categories of data based on "nothing – not even a bare bones assertion of probable cause" – could not be justified under the Fourth Amendment. *Id.*

*United States v. Sheehan*, 70 F.4th 36 (1st Cir. 2023), is similar. In *Sheehan*, the First Circuit found that even though (1) the defendant was arrested (after a seven-week investigation) for

indecent assault and battery of a child, and (2) images of child nudity had been previously seen on his phone, this information included in the search warrant affidavit did not suffice to establish probable cause to search the phone for child pornography. The court reasoned that the affidavit's description of the images failed to make the necessary showing of lewdness needed to establish probable cause of possession of child pornography. *Id.* at 45-46. Further, the Court reasoned that

> an affidavit must provide the magistrate with a substantial basis for determining the existence of probable cause. The second affidavit provides almost no basis, never mind a substantial basis, from which a magistrate could infer that Sheehan's phone contained child pornography. It does not supply any additional details about the alleged assault or Sheehan's pedophilic tendencies. **It does not state that Sheehan used a computer as part of a ploy to prey on children or that he recorded any of his assaults** . . . . The short of it is that nothing in the affidavit would permit a magistrate to infer that the assault for which Sheehan was arrested increased (to the degree required by the probable cause standard) the likelihood that evidence of child pornography would be found on his phone. Conjecture or hunch cannot fill the void.

*Id.* at 47 (internal citations omitted; emphasis added). The court continued, "The bottom line is that a cursory description of images of child nudity, coupled with the unconnected fact that the defendant was charged with indecent assault and battery of a child, does not, without further elaboration and factual support, suffice to show probable cause of possession of child pornography" on the cell phone. *Id.* at 48.

Additional similar examples exist of courts holding there must be a sufficient nexus between criminal activity and a cell phone in order for a court to validly issue a warrant to search said cell phone. *E.g.*, *State v. Smith*, 278 A.3d 481, 495-99 (Conn. 2022) ("Moreover, the defendant's Samsung cell phone was likewise never tied to the crime of aggravated assault. There must be more than just probable cause that a crime has been committed; there must also be, within the four corners of the affidavit, facts adequate for a judicial officer to form a reasonable belief that evidence of that crime will be found in a particular place. Other than his presence in the stolen

Camry eleven days after the crime, nothing in the warrant affidavit suggested that the defendant was present during the robbery and shooting of Chen, that he used the cell phone during the planning or commission of the aggravated assault, or that he possessed the cell phone at the time of the offense. The warrant application asserts that the Samsung cell phone 'constitute[d] evidence' of aggravated assault, but the affidavit attached to it gives no description of how that cell phone was itself evidence of the crime, connected to the crime, or otherwise contained evidence of the crime."); *State v. Baldwin*, 664 S.W.3d 122, 123 (Tex. Crim. App. 2022) (reversing conviction where affidavit supporting warrant for search of defendant's phone failed to supply "facts and reasonable inferences that establish a nexus between the device and the offense"); *Commonwealth v. Johnson*, 240 A.3d 575, 587-89 (Pa. 2020) ("Simply put, the affidavit of probable cause in this case provides little more than the bare fact that appellant was present in a place where illegal contraband happened to be found. That fact, in and of itself, cannot supply probable cause for a search of appellant's cell phone."); *State v. Keodara*, 364 P.3d 777, 783 (Wash. App. 2015) (warrant overbroad under the Fourth Amendment where there was no evidence "that would have linked" defendant's cell phone to the crimes listed in the warrant, including possession of firearms and possession with intent to deliver narcotics; "Nothing in the record suggests that anyone saw [defendant] use the phone to make calls or take photos . . . [and t]here was no indication that evidence of firearms or drugs were found with the phone.").

### C. **The Scant Mention Of Mr. Fitzpatrick's Specific Google Account/Email Address Did Not Provide An Adequate Nexus To Support The Wide-Ranging Search And Seizure Purportedly Authorized By The Warrant.**

Here, the affidavit for the warrant to search Mr. Fitzpatrick's specific Google account did not demonstrate a sufficient nexus to believe evidence of criminal activity (and, specifically, evidence of the specified crimes related to arson, fraud, and illegal possession of firearms and/or

ammunition) would be found there. The affidavit contained almost no mention of Mr. Fitzpatrick's specific Google account or email address. In 75 paragraphs, the Google account/email address was mentioned only three times. In the first mention, the email account was referenced as being included in a Nest user account and profile. In the second mention, it was mentioned as an email address that was used to send an innocuous email. In the third mention, it was mentioned as an immaterial part of an invoice. These three mentions do not provide an adequate nexus to support such a wide-ranging search of an entire Google account as here. Accordingly, the evidence obtained from Google should be suppressed, as well as any and all derivative evidence obtained from the invalid warrant.

## **CONCLUSION**

Mr. Fitzpatrick requests a hearing on his pre-trial motions and he reserves the right to raise arguments and issues that become apparent at the hearing. For the reasons stated herein and for any additional reasons that become apparent at the hearing, Mr. Fitzpatrick moves to suppress any and all direct and derivative evidence stemming from the constitutional violations raised herein.

Respectfully submitted,

JIM WYDA
Federal Public Defender
District of Maryland

/s/
_____
Maggie Grace (#29905)
Christina Wong (NY #5528146)
Assistant Federal Public Defenders
Federal Public Defenders Office
100 South Charles, Tower II, 9th Floor
Baltimore, MD 21201
410-962-3962
Maggie_grace@fd.org
Christina_wong@fd.org