17-1443 BPG    17-1444 BPG    17-1445 BPG

## AFFIDAVIT IN SUPPORT OF APPLICATIONS FOR SEARCH WARRANTS

I, Special Agent Clare Jeppi, being first duly sworn, hereby depose and state as follows:

### INTRODUCTION AND AGENT BACKGROUND

1.      I make this affidavit in support of an application for a search warrant under Rule 41 of the Federal Rule of Criminal Procedure for the following locations, which are further described in Attachments A-1 through A-5 (collectively, the "Target Locations"), and for the purpose of seizing the items listed in Attachments B-1 through B-5:

> (1) 11910 Emerald Court, Ellicott City, Maryland 21042 ("Target Address 1");
>
> (2) 10000 Town Center Avenue, Apt. #465, Columbia, Maryland 21044 ("Target Address 2");
>
> (3) 2016 Silver Dodge Ram, Maryland registration #9BB3250, VIN #3C7WRNEL9GG142288 ("Target Vehicle 1");
>
> (4) 2015 Chevrolet Corvette, Maryland registration #3BX0917, VIN #1G1YU2D62F5603702 ("Target Vehicle 2");
>
> (5) The person of Michael FITZPATRICK.

2.      I also make this affidavit in support of applications for search warrants pursuant to Rule 41 of the Federal Rule of Criminal Procedure for information associated with the call number 410-707-5304, as described in Attachment A-6, and the cellular telephone assigned this call number (the "Target Cell Phone"), as described in Attachment A-7. The service provider for this call number and the Target Cell Phone is Verizon Wireless, a wireless telephone service provider headquartered in the State of New Jersey. The information to be seized is described herein and in Attachments B-6 and B-7. This affidavit is made in support of applications for search warrants under 18 U.S.C. §§ 2703(a), 2703(b)(1)(A) and 2703(c)(1)(A) to require Verizon Wireless to disclose to the government records and other information in its possession pertaining to the user of the Target Cell Phone, including the contents of communications (as further

USAO-000795



described in Attachment B-6) and the location of the Target Cell Phone (as further described in Attachment B-7).

3.　　　Your affiant is an "investigative or law enforcement officer of the United States" within the meaning of 18 U.S.C. § 2510(7), that is, an officer of the United States who is empowered by law to conduct investigations of and to make arrests for offenses enumerated in 18 U.S.C. § 2516.

4.　　　Your affiant has been a Special Agent ("SA") of the Bureau of Alcohol, Tobacco, Firearms and Explosives ("ATF") since February 2000. In April 2000, I attended the Criminal Investigator Training Program at the Federal Law Enforcement Training Center in Glynco, Georgia, where I was taught and trained in the fields of criminal law, constitutional law, and federal court procedures. In the summer of 2000, I attended the New Professional Training Program at the Federal Law Enforcement Training Center in Glynco, Georgia and was specifically trained in the fields of arson, explosives, and federal firearms laws and violations. Prior to this, from May 1996 until February 2000, I was an Immigration Agent for the United States Immigration and Naturalization Service in Philadelphia, Pennsylvania. From the time I returned from ATF training at the Federal Law Enforcement Training Center in September 2000, until the present day, I have been assigned to ATF's Baltimore Field Division to conduct and assist investigations involving firearms, narcotics, arson and explosives.

5.　　　Throughout most of my tenure as a SA in the Baltimore Field Office, I have been assigned to several enforcement groups in Baltimore and Prince George's Counties, in which the primary focus of these investigations was firearms and narcotics trafficking. I have served as the case agent for numerous investigations that have included adopted firearms cases from state and local agencies as well as more complex investigations involving illegal firearms possession,

2

armed narcotics traffickers, and burglaries of Federal Firearms Licensees (FFLs). I have also participated in several arson and explosives investigations since my tenure began with the ATF. In late 2015, I was assigned to the Baltimore Field Division's Arson & Explosives Group whereby I have been appointed to serve as the case agent or participant on several investigations under those purviews. My experience in the Baltimore Field Division's Arson & Explosives Group has included supervisory roles within the group, fire scene processing, evidence collection, witness interviews, and other investigative tools in support investigations involving arson and explosives. I have worked numerous investigations in which I have applied for and received court orders and search warrants for historical and real-time cell phone information, and applied that cell phone information in order to ascertain co-conspirators and other aspects of the crime. My experience with precision cell site information has afforded me the opportunity to gauge patterns and practices of my suspects, and potential stash houses or other locations which may have items of significant evidentiary value. My testimony has been accepted by the courts of the United States of America and has resulted in convictions of persons for violations of federal laws.

6.      The facts in this affidavit come from my personal observations, my training and experience, and information obtained from other agents and witnesses. This affidavit is intended to show merely that there is sufficient probable cause for the requested warrant and does not set forth all of my knowledge about this matter.

7.      Based on my training and experience and the facts set forth in this affidavit, there is probable cause to believe that violations of the following statutes have been committed, are being committed, and will be committed by Michael Fitzpatrick and others: 18 U.S.C. § 922(g) (possession of firearms and ammunition by a prohibited person); 18 U.S.C. §§ 1341, 1343, and

3

1349 (mail fraud, wire fraud, and related conspiracy); 18 U.S.C. § 844(h),(m) (use of fire to

commit a federal felony and related conspiracy); and 18 U.S.C. § 844(i),(n) (malicious

destruction of property by fire and related conspiracy). There is probable cause to believe that

the Target Locations, as described in Attachments A-1 through A-5, contain evidence of these

criminal violations, as described in Attachments B-1 through B-5. There is also probable cause

to believe that the contents of communications and location information described in

Attachments B-6 and B-7 will constitute evidence of these criminal violations and probable

cause to search the information described in Attachments A-6 and A-7 for this evidence.

        8.     Based upon your affiant's training and experience, participation in this and other

arson and firearms investigations, as well as her conversations with other agents, your affiant

knows that persons who commit or conspire to commit arson often do so to collect on fraudulent

insurance claims and will remove items of value, both financial and sentimental, (such as

computers, electronics, expensive vehicles, family photographs, awards, certificates, furniture,

and other household items) from the property to be destroyed, and will do so to alleviate

personal/commercial debt. Based on training and experience, I also know that persons who

commit or conspire to commit arson for profit or to defraud, or have knowledge of such acts:

        a.     commonly maintain financial records and financial instruments related to

such crimes and the profits derived from those acts and transactions, including, but not limited

to, currency, bank checks, cashier's checks, Western Union receipts, money orders, stocks,

bonds, precious metals, real estate records, books, ledgers, records and other documents relating

to their bank accounts, credit cards, tax records, financial correspondence, and insurance

policies, claims, and correspondence;

        b.     commonly maintain books, records and other documents that identify and

4

contain the names, addresses and/or telephone numbers of associates in their fraud or criminal activities, including, but not limited to, address books, telephone books, rolodexes, telephones or personal digital assistants with stored information, notes reflecting telephone numbers, photographs (to include still photos, negatives, movies, slides, video tapes, digital video discs, undeveloped film, memory cards, and digital image and video files), computers, tablets, cell phones, and other digital electronic devices;

        c.     commonly maintain identification and travel documents, including, but not limited to, tickets, transportation schedules, passports, notes and receipts related to travel, and motel/hotel receipts; and

        d.     typically store or maintain indicia of occupancy, residency and/or ownership of the premises and/or vehicles to be searched, and are often present in such premises;

        e.     remove the aforementioned documents and information and other items of practical, financial, and sentimental value from the property to be destroyed to locations where these items can be concealed from insurance and/or law enforcement investigators while remaining accessible to the owner, such as their homes, garages, and vehicles; and

        f.     commonly store ignitable or incendiary materials locations where these items can be secured and concealed from insurance and/or law enforcement investigators while remaining accessible to the owner, such as their homes, garages, and vehicles.

9.     Based upon your affiant's training and experience, participation in this and other arson and firearms investigations, as well as her conversations with other agents, your affiant also knows that persons who possess firearms and ammunition but are prohibited by law from doing so typically store firearms, ammunition, and firearms parts and components inside combination or key lock safes or strong boxes, suitcases, locked cabinets and other types of

USAO-000799

locked or closed containers, or hidden compartments, which are secreted in locations where they may keep these items secure, concealed, or otherwise inaccessible to law enforcement, such as their homes, garages, and vehicles. I also know that users of cell phones, smart phones, and other personal electronic devices and mobile electronic storage media commonly store these items on their person.

## **PROBABLE CAUSE**

10.     On March 10, 2017, at approximately 2355 hours, Howard County 911 received multiple calls reporting a fire at 11910 Emerald Court, Ellicott City, Maryland 21042 ("Target Address 1"). Responding firefighters encountered a single family home fully engulfed in flames. The cause of the fire is undetermined at this time. The structure was deemed uninhabitable. Michael Fitzpatrick ("FITZPATRICK") was identified as the homeowner. This information was verified through Maryland Department of Assessments & Taxation - Real Property. FITZPATRICK is depicted and further described in Attachment A-5.

11.     Additionally, throughout the course of the investigation, it was learned that the residence located at Target Address 1 was also used as FITZPATRICK's commercial business location. FITZPATRICK's business, RMF Inc., specialized in landscaping and snow removal, and investigators learned via witness statements that FITZPATRICK operated his business out of this home office. Several large trucks with the RMF logo or associated with the business were located on the premises of Target Address 1, as well as snow removal equipment, tools, construction vehicles and supplies. Also located on the premises of Target Address 1 was a detached garage/ pole barn and multiple trailers.

12.     There were also two vehicles in the garage attached to the house that were damaged by the fire--specifically a Chevrolet Camaro and a BMW X5. While processing these

6

cars and the rest of the fire scene, investigators observed that these vehicles were completely empty. Moreover, there was no paperwork, indicia, registration, insurance cards, car manuals, repair orders, or other ancillary items (water bottles, napkins, etc.) that may typically be found in a vehicle. The only item found was a dog blanket in the BMW.

### Statements of Michael Fitzpatrick – March 11, 2017

13.     During the early morning of March 11, 2017, a short time after the fire, FITZPATRICK arrived at the scene.  Howard County Police Department ("HCPD") Detective Marc Delbusso interviewed FITZPATRICK.  FITZPATRICK was utilizing crutches and had a cast on his left leg.  He advised that he recently had surgery on his foot on March 9, 2017. FITZPATRICK stated that he left the residence on March 9, 2017, at approximately 0930 hours for his scheduled surgery. Subsequent to his surgery, he was picked up by his fiancé, Linda Rabinovich. Due to the surgery, and for his recovery, FITZPATRICK made arrangements with Ms. Rabinovich to stay at her home for approximately one week (7 days). FITZPATRICK denied having any major problems with his home but did advise that the circuit breaker would "trip" in his home office. FITZPATRICK believed it may have to do with the use of his printer, and stated this "tripping" activity would happen approximately once a week. FITZPATRICK owns three dogs of which he dropped off two at his ex-wife's (Allison Fitzpatrick) home to care for them during his surgery, and the third dog was brought to Ms. Rabinovich's residence.

14.     FITZPATRICK had a Nest Thermostat (Wi-Fi) and Nest Smoke Detector (Wi-Fi) installed in his home, the scene of the fire. FITZPATRICK voluntarily showed investigators his cell phone screen, which displayed the Nest application, and, as he handed his phone to investigators, he expressed confusion and advised police he was unsure of how to utilize the application. Investigators noted a message displayed on March 10 that read: "Offline." When

7

the "Offline" message was accessed, investigators noted the system went "Offline" at approximately 1900 hours, approximately five hours before the fire.

15.    As the interview continued, FITZPATRICK voluntarily drew a sketch of the interior of his home. This sketch included his home office, where he advised his printer would sometimes cause the breaker to trip, and advised the printer was plugged into a power strip that was plugged into a wall outlet. FITZPATRICK asked about the status of his cars; however, he never asked or commented regarding the status of any other items in his home.

16.    FITZPATRICK utilized a cell phone assigned the call number 410-707-5304 throughout his communications with law enforcement and fire officials as the fire scene processing ensued.

### Statements of Allison Fitzpatrick – March 11, 2017

17.    On March 11, 2017, HCPD Detective Scott Heaster interviewed Allison Fitzpatrick, FITZPATRICK's ex-wife. Ms. Fitzpatrick advised, among other things, that the couple owned a vacation home in the Smith Mountain Lake area when they were married, and provided the address to the police as 300 Indian Ridge Drive, Moneta, Virginia 24121 (the "Moneta Property"). Ms. Fitzpatrick advised the detective of how the transaction occurred that ultimately turned the property over to FITZPATRICK after their divorce, and called this home the "stolen" house because of the trickery she claimed occurred.   Additionally, she advised Detective Heaster that FITZPATRICK had brought her a dresser from this location a few weeks ago and, when he did, he dropped off a large stack of family photographs from the Target Address 1. When she was asked about this activity, Ms. Fitzpatrick responded that she found this odd because they both argued over the photographs when they were going through the divorce.

8

## Statements of Jonathan Weizman – March 12, 2017

18.     On the morning of March 12, 2017, your affiant and ATF Special Agent Daniel Giblin interviewed Jonathan Weizman at his residence. During the course of the interview, Mr. Weizman described how he was an employee of FITZPATRICK's RMF landscaping company, and he considered FITZPATRICK both a very close friend and his boss. He advised that he and FITZPATRICK go to the race track together at Virginia International Raceway or Summit Raceway in West Virginia, adding that FITZPATRICK races cars and instructs race car driving. When asked about the last time he spoke with FITZPATRICK, he advised that he spoke to FITZPATRICK that day about getting the trucks out for the upcoming snow event, and prior to a fence being installed on his property. (This fence would be placed by law enforcement and/or fire personnel to secure the fire scene.)

19.     SA Giblin and I then asked Mr. Weizman specifically about the days surrounding the fire and Mr. Weizman's activities and schedule during that time period.  Mr. Weizman informed these agents that he had been working at the Target Address 1 on the date of the fire, March 10, 2017, beginning around 7:45 a.m. Mr. Weizman stated that he left the Target Address 1 at certain times that day to accomplish work-related tasks but was at the property between approximately 1:00 p.m. and 2:00 p.m. and at approximately 6:30 p.m. He advised that his work tasks that day included fueling up trucks and retrieving company property from other locations.

20.     Mr. Weizman advised further that, on the day before the fire, he took FITZPATRICK to have surgery, and that FITZPATRICK was staying with his girlfriend post-surgery. Mr. Weizman advised that he took FITZPATRICK's BMW vehicle to take FITZPATRICK to surgery and returned it to the garage attached to the house at the Target Address 1.

9

21.     Mr. Weizman advised your affiant that FITZPATRICK contacted him the night of the fire to ask him to pick him up and take him to the scene of the fire. Call detail records confirm this call from FITZPATRICK's cell phone number 410-707-5304 to Mr. Weizman at approximately 12:26 a.m. on March 11, 2017.  FITZPATRICK had received a call regarding the fire at Target Address 1.  Mr. Weizman picked up FITZPATRICK from his girlfriend's house and took him to the scene of the fire. Mr. Weizman advised he stayed with FITZPATRICK when they arrived on scene, and walked down the road with him.  After answering questions, Mr. Weizman advised that he took FITZPATRICK back to his girlfriend's residence. Mr. Weizman advised that FITZPATRICK's Chevrolet Corvette ("Target Vehicle 2") was at the dealership at the time of the fire.  Target Vehicle 2 was normally parked in a lower-level garage attached to the house at Target Address 1, but it had been taken into the shop on the Monday before the fire.

### Consent Search of Target Address 1 – March 12, 2017

22.     On March 12, 2017, Detective Delbusso interviewed FITZPATRICK at Ms. Rabinovich's home.  At that time, FITZPATRICK gave investigators written consent to access trailers and the detached garage located on the premises of Target Address 1.  While speaking with Detective Delbusso about the fire, FITZPATRICK asked, "Was it electrical?"  Detective Delbusso asked FITZPATRICK to show him his Nest (Wi-Fi Thermostat) application on his cell phone.  FITZPATRICK voluntarily complied.  Detective Delbusso noticed there was no longer an "Offline" message as previously viewed.

23.     Later that evening, and pursuant to the consent search, Detective Delbusso and other investigators located a computer (tower unit), printer, and computer monitor in the detached garage/ pole barn to the rear of Target Address 1.  These items were not set up,

10

connected, or receiving power, and they were located on the cement floor to the rear of the detached garage.  The outbuilding was not set up for an office.

24.     Detective Delbusso received consent from FITZPATRICK to search his black/gray trailer (Maine registration #19TLR79720, VIN #564BEI628ER0049O8) that was parked on the driveway towards the back of Target Address 1, and in front of the aforementioned detached garage/ pole barn.  A search of the black/gray trailer resulted in the recovery of a manufactured AR-15 style rifle, having a Juggernaut Tactical Model JT-15 lower receiver.  Also located in the trailer was a shipping box with a shipping label affixed to the top addressed to Michael Fitzpatrick at Target Address 1, containing several smaller boxes of TulAmmo .223 rounds of ammunition.  FITZPATRICK also provided consent for investigators to search a red trailer (Maine registration #19TLR79721, VIN #5WKBE2423A1008679) that was also on the property, which contained landscaping equipment and four-wheel vehicles.  A small black trailer (VIN #542GJ4839EB007790) was also located on the premises of Target Address 1.

### Statements of Jonathan Weizman and Bryan Hardaway – March 13, 2017

25.     The following morning, on March 13, 2017, your affiant interviewed Jonathan Weizman, who advised that the aforementioned AR-15 manufactured firearm was his, and he built the firearm with a special tool located in FITZPATRICK's garage.  Mr. Weizman provided a sworn written statement attesting to this, but also advised that he and FITZPATRICK had an agreement that if he (Weizman) built the firearm, and FITZPATRICK purchased the ammunition, FITZPATRICK could shoot the firearm.  Mr. Weizman added in his sworn statement that he and FITZPATRICK have gone shooting with that firearm in Moneta, Virginia during race weekends.

11

26.    On March 13, 2017, your affiant and Detective Heaster interviewed Bryan Hardaway at his place of employment located at Win Kelly Chevrolet, 12421 Auto Drive, Clarksville, Maryland. Mr. Hardaway was questioned in reference to his activities surrounding the time of the fire. Throughout the course of the investigation, it was learned that Hardaway was allowed to park his trailer/ camper on in the rear of the FITZPATRICK's property in Ellicott City (Target Address 1) in exchange for work performed on Target Vehicle 2, FITZPATRICK's Corvette. Mr. Hardaway described himself as a specialist when repairing Corvettes, and he worked on these types of vehicles at Win Kelly Chevrolet. He advised that he worked at Win Kelly Chevrolet until approximately 7:30 p.m. on March 10, 2017, and returned home to the trailer/ camper at Target Address 1. He advised that he left Target Address 1 at approximately 8:30 to 8:45 p.m. that night, and he did not observe anything strange or irregular with the property. According to fire investigators, the fire began only a few hours later, at approximately 11:55 p.m.

27.    A review of call detail records associated with Mr. Hardaway's phone number reveals that on March 9, 2017 (one day before the fire), Mr. Hardaway exchanged phone calls and texts with FITZPATRICK approximately 10 times, and at 9:30 p.m., he spoke with FITZPATRICK for approximately six minutes.

28.    On March 10, 2017 (the date of the fire), at 12:19 p.m., Mr. Hardaway received a call from 213-545-1711, a number that, when run in local indices, returns to a "Bandwidth.com address." (Bandwidth.com is a nationwide communications and "VOIP" service provider and is commonly called a "gatekeeper." VOIP service providers are those providers who provide voice over internet protocol calls, or calls that typically go "over the Internet." Your affiant knows through her training and experience that individuals who apply for a phone number for this type

12

of VOIP calls typically do so to conceal their main phone number and thus their true identity.)
This communication took place for approximately ten seconds . Mr. Hardaway received another
communication at approximately 1:08 p.m. from the same number. (According to his statement,
Mr. Hardaway returned to Target Address 1 at approximately 1:00 p.m. that day to retrieve a part
or tool for a car.) Although Mr. Hardaway's call detail records show additional calls returning to
Bandwidth,com, it is important to note that the aforementioned calls on the date of the fire are
the first calls with the "1711" call number ever observed in the call detail records, which date
back to October 2016. Mr. Hardaway received three more communications from the "1711"
number at 2:35 p.m., and several more communications from this same number throughout the
evening. At 6:38 p.m., he received the last communication from the "1711" number until days
after the fire, on March 13, 2017.  .

29.     Your affiant notes that, in a later interview with Linda Rabinovich,
FITZPATRICK's former fiancé, she advised investigators that she visited the fire scene at Target
Address 1 with FITZPATRICK the day after the fire, and Mr. Hardaway was present. She
advised that Mr. Hardaway made a comment about Target Vehicle 2 not being present during the
fire. She advised that Mr. Hardaway's statement and mannerisms were strange and that
FITZPATRICK responded by giving Mr. Hardaway an intense look of anger, which she
interpreted as telling Mr. Hardaway to be quiet.

## Statements of Linda Rabinovich

30.     On March 13, 2017, Linda Rabinovich, FITZPATRICK's fiancé at the time,
contacted Detective Delbusso.  She advised she was very concerned about items she recently
discovered in her home belonging to FITZPATRICK.  Ms. Rabinovich advised Detective
Delbusso that she was cleaning out a closet (located in computer room/ home office), and she

13

does not regularly use the closet in question. She located additional clothing belonging to FITZPATRICK, which surprised her because FITZPATRICK was only supposed to stay at her home for about a week after his surgery. Ms. Rabinovich grew more suspicious and looked around the office where FITZPATRICK had set up his work computers for the week. Ms. Rabinovich photographed a "Spreadsheet-style" document on FITZPATRICK's computer which displayed some of FITZPATRICK's financial liabilities and outstanding bills. Based on the information on the spreadsheet, it appeared that FITZPATRICK owes approximately $1,000,000 to various creditors. Ms. Rabinovich located a black padfolio with FITZPATRICK's initials on the front containing sentimental pictures of FITZPATRICK's children when they appeared to be approximately 8-10 years old, and handmade holiday cards from his children that appeared to be several years old. Ms. Rabinovich located a bill from the Internal Revenue Service ("IRS") revealing that FITZPATRICK owed over $118,000, and she located multiple computers and related equipment, including a tower unit, tablet, portable external hard drive, tower unit hard drive, and SD cards.

31. On March 14, 2017, detectives from HCPD Criminal Investigations Section and an ATF agent responded to Ms. Rabinovich's residence per her request. Detectives seized numerous electronic devices, documents and files with her consent. These items were secured at HCPD Southern District Police Station in preparation for a search and seizure warrant.

32. Ms. Rabinovich advised that on March 11, 2017, she witnessed FITZPATRICK receive a phone call from Allstate Insurance regarding a fire insurance claim. Ms. Rabinovich described FITZPATRICK as having "fake tears" when speaking with the Allstate representative. Ms. Rabinovich felt FITZPATRICK was acting distraught just for the Allstate phone call, because he immediately reverted to his normal, calm demeanor once the phone call ended. A

14

review of call detail records for the number 410-707-5304 confirm this call on March 11, 2017, from the Allstate Insurance Company. Ms. Rabinovich also questioned certain activities and behaviors exhibited by FITZPATRICK months before the fire that were suspicious to her. For example, FITZPATRICK removed his home television and took it to Ms. Rabinovich's home, although her television was functioning properly. FITZPATRICK removed a large amount of bakeware/cookware from his home and gave it to Ms. Rabinovich, although she stated she had no need for these items. FITZPATRICK removed his home wireless speaker sound system and brought it to Ms. Rabinovich's home. FITZPATRICK also brought over a large box of Fiber One bars believed to be purchased from Costco to her house. Ms. Rabinovich recalled this because as she advised investigators, these style snack bars were Ryan Fitzpatrick's (FITZPATRICK's son) favorite. She recalled this activity disturbed her because she knew of Ryan's feelings about the snack bars, and was confused about why they were taken from the Target Address 1 where Ryan lives on a part-time basis with his father. Ms. Rabinovich told investigators she did not request any of the above listed items from FITZPATRICK.

33.    Additionally, Ms. Rabinovich recalled a time before the fire occurred that she and FITZPATRICK went on a walk around the neighborhood and commented on a home that she thought was beautifully built but had unsavory colors. She advised that FITZPATRICK asked her what colors would she like to have if they were to build a home. Ms. Rabinovich did not find the question odd at the time, but in light of recent events, she advised the investigators of this conversation. Additionally, FITZPATRICK brought over several large-screen computer monitors, files, a file cabinet and documents, along with men's suits, and other items—all inconsistent with a short, seven (7) day stay for recovery following surgery.

15

34.     Ms. Rabinovich told investigators that she went to the gun range with FITZPATRICK on at least two occasions.  She advised that FITZPATRICK brought several firearms with him, including long guns and handguns, which were in the trunk of his car.  Ms. Rabinovich added that FITZPATRICK brought the ammunition that corresponded to the firearms he brought with him.  She added that she and FITZPATRICK shot the guns at stuffed animals and water bottles. Ms. Rabinovich advised that on one occasion they shot at an outdoor range located on the premises of Jonathan Weizman's family farm, and on another occasion, they shot at a range possibly near White Marsh, Maryland. When asked for specifics regarding numbers and types of firearms, Ms. Rabinovich advised that on the occasion they went with Mr. Weizman, there were "a bunch" or "tons," including handguns, rifles, and "semi-automatics." There were tons." When asked who brought the firearms to the range, Ms. Rabinovich responded, "Mike did, and Jon brought some also."  When asked about the accompanying ammunition, Ms. Rabinovich said there were "lots of bullets" in the back of FITZPATRICK's BMW X5 vehicle. Ms. Rabinovich recalled on one occasion she fired a semi-automatic, she tried shooting a revolver, and she tried shooting what she described as a machine gun, but later determined it was a semi-automatic rifle. She later stated she was unsure about the firearms being rifles, but advised again that there were all types of firearms. When asked where FITZPATRICK would store them, Ms. Rabinovich suggested Jonathan Weizman's family farm. Additionally, she advised that FITZPATRICK and Mr. Weizman had traveled to the Moneta Property a couple weeks before the fire.

### Arrest and Interview of Michael Fitzpatrick – March 14, 2017

35.     During the course of the investigation, your affiant reviewed a certified copy of FITZPATRICK's criminal history, and consulted with counsel to confirm that FITZPATRICK is

16

prohibited from possessing firearms and ammunition because he was found guilty of a crime punishable by a term exceeding one year. Mr. Weizman is not a prohibited person; however, I requested information from the Maryland Gun Center confirming that Mr. Weizman was checked through the Maryland Automated Firearms Services System (MAFSS) database. Mr. Weizman does not have any firearms listed in this database and does not have a handgun permit issued by Maryland State Police Licensing Division appearing in MAFSS. (The State of Maryland does not have any reciprocity agreement with any other state as it pertains to handgun permits.)

36.     On March 14, 2017, FITZPATRICK was arrested on state violations for illegally possessing a regulated firearm and ammunition, in reference to the aforementioned firearm and ammunition recovered from Target Address 1, and two cell phones were seized. After he was transported to a Howard County Police station and advised of his Miranda rights, FITZPATRICK agreed to speak with your affiant and Detective Delbusso. After being advised of his prohibited status and the reason for arrest, FITZPATRICK ultimately admitted to shooting the aforementioned firearm at a range and purchasing the ammunition that was recovered from his trailer. However, FITZPATRICK denied shooting several different types of firearms as indicated by Ms. Rabinovich. He also advised that he was attempting to get his record fixed (expunged) with his attorney, acknowledging he knew he had a criminal history prohibiting him from possessing firearms.

37.     When asked about what items he brought to Ms. Rabinovich's home, FITZPATRICK stated that he only kept a shaving kit and some clothes at her home. When asked why he had a folder or padfolio containing children's pictures and cards, he responded that he took them everywhere, even on vacation. Detective Delbusso asked FITZPATRICK to

17

USAO-000811

describe his current financial situation, and FITZPATRICK advised "good" and made no indication that he or his business was in financial distress. When investigators confronted him with the $118,000 IRS tax bill, he first suggested that the bill may be fraudulent, and he later acknowledged he has not filed tax returns for the past three (3) years. FITZPATRICK advised he owns a single family home in Virginia and two (2) Acura NSX race cars (valued at approximately $150,000), which he normally stores in a two-car garage attached to the house at the Target Address 1. FITZPATRICK advised he relocated the Acura NSX race cars to his detached garage/pole barn (that is commonly called the "shop") on the premises of Target Address 1, which was not damaged by the fire. He acknowledged the race cars were moved out of his garage a few days prior to the house fire. Detective Delbusso asked if he had moved any of his property to the Moneta Property, and he advised he does not visit that home very often in the winter. FITZPATRICK advised that he made two (2) trips to that location (over the past two months) to move his "outdoor" porch furniture to that residence, because it was stored outdoors at the Target Address 1. FITZPATRICK also advised that he moved a leather couch, originally stored in the basement at the Target Address 1 to the Moneta Property.

38.     After being processed for the state firearm and ammunition offenses, on March 15, 2017, FITZPATRICK was released on bond.

39.     Throughout the investigation, during correspondence with Linda Rabinovich, she advised Detective Delbusso that FITZPATRICK was very proficient with technology (computers, etc.). She stated her "jaw dropped" when Detective Delbusso advised that FITZPATRICK originally stated to firefighters that he did not know how to use his Nest (Wi-Fi Thermostat) application. She stated that she and FITZPATRICK went on several vacations over the past eighteen (18) months, and she never observed FITZPATRICK take his children's

18

sentimental pictures and handmade cards on their vacations as he indicated in his post-Miranda interview. She advised that he always kept those items in his home office at the Target Address 1. Rabinovich added that approximately three (3) weeks prior to the house fire, she observed missing or removed ceiling tiles and wires were hanging down from the drop ceiling in the basement of the house at the Target Address 1.

40.    On March 19, 2017, investigators interviewed Ms. Rabinovich who advised that she recently communicated with FITZPATRICK via text, and he asked her "test questions" in an effort to ensure he was speaking to her and not the police. During these texts, FITZPATRICK advised her that he hid money in her sweater drawer at her residence. Ms. Rabinovich looked in the drawer and advised she found a pair of surgical socks stuffed with several packages or envelopes of money. Rabinovich stated there were between eight and ten such packages stacked, each labeled 5k. Based on the labeling, she estimated that the packages contained approximately $40,000 to $50,000. Ms. Rabinovich advised FITPZATRICK she would return it to him via courier; however, she was keeping a portion of it for a Cartier watch that was missing that she believed he took from her. FITZPATRICK agreed to the transaction, and Ms. Rabinovich arranged for the return of his money and some other personal items via a courier.

### Statements of Ryan Fitzpatrick – March 19, 2017

41.    On March 19, 2017, investigators interviewed Ryan Fitzpatrick, FITZPATRICK's son, regarding items that were at the house at the Target Address 1 before the fire occurred. Ryan Fitzpatrick is a juvenile and was accompanied by his mother Allison Fitzpatrick for the duration of the interview. He was shown the picture of the aforementioned computer, monitor and printer that were located pursuant to the consent search in the detached garage/ pole barn at Target Address 1. Ryan advised that the computer tower belonged to him and was in his

19

bedroom at the Target Address 1.  When asked, he stated the last time he observed his computer

in his bedroom was on Wednesday, March 8, 2017, two days prior to the house fire, when he left

the house to stay with his mother.  He also advised the monitor and printer in the detached

garage belong in his father's home office that was located at the Target Address 1.  (These items

were not seized during the consent search because, at that time, investigators did not have the

information that was learned during the interview with Ryan Fitzpatrick.)  When asked about

furniture and other items in the Emerald Court residence, he recalled that weeks before the fire,

he and a friend went downstairs in the Emerald Court house, and the leather couch that had been

there had been removed, and there was just an open space. Several days or so later, Ryan

advised, an older plaid couch from the Moneta Property had been placed in the basement of the

Emerald Court home, where the open space had been, and where the expensive leather couch had

previously been located.  Ryan was asked about the contents of the Emerald Court house before

he left to stay with his mother. Ryan advised that in the time before the fire, FITZPATRICK

described his behavior as de-cluttering, and he and FITZPATRICK packed up several toys and

other household items to support this effort.  When asked about sentimental items, Ryan advised

that his father packed up his trophies from his racing competitions and stored them in a box on

the floor. (Your affiant notes that no trophies, or portions or remains of trophies were found at

the scene or in the fire debris at the Target Address 1.)

42.     Your affiant asked Ryan if he ever went shooting with his father, and he replied

affirmatively. Ryan advised that he travelled with his father in the BMW X5 vehicle to the

location where they went shooting.  When I asked him about the type of firearms

FITZPATRICK used, he responded "an AR."  Ryan stated that the firearm was in the back of the

20

vehicle and that his father brought his own ammunition. Ryan advised that it was an outdoor range, and they shot at targets.

### Search of the Moneta Property and Witness Statements

43.    On or about March 15, 2017, local law enforcement investigators assisting with the investigation contacted neighbors of the Moneta Property. A neighbor advised that FITZPATRICK does not normally stay at the residence in the winter. This neighbor advised he has recently observed FITZPATRICK make trips to the home during the weeks preceding the fire at Target Address 1. The neighbor advised he observed "trucks and trailers" at the residence, specifically stating that this behavior was "not normal."

44.    On March 24, 2017, investigators executed a search warrant at the Moneta Property, 300 Indian Ridge Road, Moneta, Virginia. Investigators located items that were originally in the residence at the Target Address 1, including furniture that had been moved from the Emerald Court address, sentimental items, children's memorabilia and toys, and other items. Some of the sentimental items included a coat hanger with beads, medals, awards and membership badges identifying FITZPATRICK's daughter Mikaila as the owner. (Your affiant notes that, during a subsequent interview on April 7, 2017, Mikaila Fitzpatrick advised investigators that the items found on the coat hanger were hanging on a hook in the closet of her bedroom at the Target Address 1.)

45.    Additionally, during the execution of the warrant, several investigators were tasked to leave the scene to interview Damian Adam Harless, who lives in close proximity to the Moneta Property, and who investigators learned was FITZPATRICK's close friend. During the interview, Mr. Harless admitted to investigators that FITZPATRICK called him and requested that he remove ammunition and pre-printed checks from the Moneta Property. This request

21

occurred after FITZPATRICK's arrest for the aforementioned firearm and ammunition. Mr. Harless abandoned these items to law enforcement, specifically a box of pre-printed checks in the name of Century Enterprises, ten (10) AR-15 thirty (30) round magazines, 500 rounds of American Eagle .223 ammunition, and 300 rounds of Speer .223 ammunition. Mr. Harless advised the agents that FITZPATRICK told him that the ammunition belonged to "Jon," referring to Mr. Weizman. (Your affiant notes that other than the aforementioned firearm recovered from Target Address 1 pursuant to the consent search, there were no firearms or remains of firearms found at the scene of the fire at the Emerald Court Property, or during the search of the Moneta Property.)

46.    Subsequent to the search warrant, on the following day, your affiant received information from local investigators that FITZPATRICK was seen in the town of Moneta, and a vehicle was parked in the driveway of the Moneta Property. I requested information regarding the registration of this vehicle from the ATF communications center, which advised that the vehicle belonged to Naomi Fort, Mr. Weizman's girlfriend, who resides at 7400 Travertine Drive, Unit #207, Baltimore, Maryland. This is the address Mr. Weizman provided as his address to investigators and where Special Agent Giblin and I interviewed him on the morning of March 12, 2017, after the fire.

### Michael Fitzpatrick's Insurance Policies and Use of the Target Cell Phone

47.    In several interviews with family members, investigators learned that FITZPATRICK was in possession of two phones, both similar in appearance, but the number to one of the phones was unknown by all witnesses. Witnesses and family members advised that they called or texted the call number 410-707-5304 when communicating with FITZPATRICK. Both cell phones were seized at the time of FITZPATRICK's arrest on March 14, 2017. The

22

investigation has revealed that FITZPATRICK has continued to utilize the call number 410-707-5304 following his release in order to communicate with insurance companies and other individuals, indicating that he has obtained a new cell phone to which the number 410-707-5304 has been assigned (the "Target Cell Phone"). For instance, phone records for this number following the seizure on March 14, 2017, reveal numerous contacts with several of the same numbers contacted prior to the seizure.

48.     During the course of the investigation, investigators received information that FITZPATRICK currently holds a homeowner's insurance policy with the Allstate Insurance Company, policy number (PN) 918829914. As of February 10, 2016, the policy coverage limits were as follows: dwelling protection with building structure reimbursements extended limits of $612,238; other structures protection of $61,224; personal property protection – reimbursement provision for $459,179; additional living expense for $183,671; family liability protection for $300,000; guest medical protection for $1,000 each person; and sewer backup protection for $20,000 each occurrence. The total of coverage relevant to the fire that occurred on March 11, 2017, is approximately $1,316,312. This amount includes the dwelling, other structures, personal property and additional living expenses. Standard claims on this policy carry a deductible of $500 per each respective covered item and occurrence. Additionally, FITZPATRICK has an insurance policy for two vehicles that were damaged in the fire, specifically a 2017 Chevrolet Camaro, and a 2011 BMW X5 SUV. FITZPATRICK also maintains an insurance policy with the Erie Insurance Company for a truck that was also damaged by the fire.

49.     On May 10, 2017, Lieutenant Craig Matthews with Howard County Office of the Fire Marshal was advised by Allstate that all correspondence has been mailed to FITZPATRICK's temporary housing location, 10000 Town Center Avenue, Apartment #465,

23

Columbia, MD 21044 ("Target Address 2") and that Allstate is paying approximately $2600.00 per month rent at this location for FITZPATRICK's temporary housing. Allstate has not yet received from FITZPATRICK the documentation necessary to process his insurance claim and is unsure how he will return the documents. A review of cellular telephone records received from Verizon Wireless for the number 410-707-5304 revealed that FITZPATRICK contacted Allstate Insurance on numerous occasions after the fire at the Emerald Court Property. Additionally, a review of FITZPATRICK's call detail records revealed that FITZPATRICK contacted the Allstate Insurance Company in Alexandria, Virginia prior to the fire, using his cellular phone on December 30, 2016; February 23, 2017; and two times on March 1, 2017. On March 8, 2017, just two days before the fire, call detail records reveal FITZPATRICK communicated with Allstate via number 410-707-5304. The call was over seven minutes in duration.

50.     According to an Allstate Insurance communications transcript, on March 12, 2017, at approximately 10:26 a.m. Eastern Standard Time, an Allstate representative spoke with FITZPATRICK using the call number 410-707-5304. This phone number was remarked in the representative's report as a "successful contact #." During this conversation with the insurance company, FITZPATRICK discussed a claim for losses arising from the fire. FITZPATRICK indicated that he just had major surgery, was admitted to a hospital, and may be discharged from the hospital the following day (March 13, 2017). Investigators know that FITZPATRICK was not in the hospital at the time because he had been driven to the Target Address 1, and had spoken with investigators on March 11, 2017, at the fire scene and on March 12, 2017, at Ms. Rabinovich's home. Some of the other "loss facts" captured in the transcript were the "cause and origin was unknown at this time, and the house is a total loss."

USAO-000818

51.     Additionally, on April 3, 2017, a representative with the Allstate Insurance Company interviewed FITZPATRICK and took a recorded statement regarding the items that were lost as a result of the fire. When asked about the two high-value racecars, FITZPATRICK advised that, at the time of the fire, they were located in my "shop, in my lower garage," referring to the large detached garage/ pole barn in the back of Target Address 1. When asked if they were typically located there, FITZPATRICK advised that one is usually in the lower-level garage attached to the house but that he moved both cars a week before the fire occurred because he was in the process of selling them. (Your affiant notes that, during an interview with investigators on March 12, 2017, a neighbor of FITZPATRICK at the Target Address 1 advised that early during the week of the fire, he observed a race car being moved from the lower-level garage attached to the Emerald Court house to a trailer located near the detached garage.

52.     During the recorded Allstate interview, FITZPATRICK advised that he has additional personal vehicles that are registered to him: specifically, three 2016 Dodge pickup trucks, a 2014 Dodge pickup truck, and a 2005 Ford pickup truck. He also advised he owns a 2015 Chevrolet Corvette (Target Vehicle 2) that was not damaged by the fire because it was placed in the shop for repairs the week before the fire. FITZPATRICK advised that he had computers in the office area including one CPU, a Dell laptop, other laptops, and two monitors. FITZPATRICK advised that there was an IMAC computer located in the kitchen. Additionally, in his recorded statement, FITZPATRICK advised that his son Ryan had a desktop computer and a monitor in his bedroom. (Your affiant notes that no IMAC computer, nor portions thereof, were recovered from the fire debris, and that Ryan's computer was found disconnected on the floor of the pole barn on the Target Address 1 premises during the aforementioned consent search.)

25

53.    During the recorded statement, FITZPATRICK also advised the Allstate representative that the older couch from the Moneta Property was moved to the Emerald Court residence and the leather couch that was at the Target Address 1 was taken to the Moneta Property. FITZPATRICK also admitted to switching out a table, and a glass desk was moved to the Moneta property from the Emerald Court residence. When asked who helped him move the property, FITZPATRICK responded, "I have John Weizman." (Your affiant notes that that this statement was taken after the aforementioned search of the Moneta Property and FITZPATRICK was advised of items that were seized pursuant to the warrant.)  During the recorded statement, FITZPATRICK also advised that he owns several trailers. When asked if he used the trailer that is present on the Target Address 1 at the time of the interview, FITZPATRICK responded affirmatively.  At the end of the interview, FITZPATRICK advised the investigator that his estimated gross income is $350,000 per year, and that he does NOT have any unpaid taxes or tax liens.

54.    On May 12, 2017, Lt. Matthews advised by Erie Insurance that FITZPATRICK has requested an email address for Erie Insurance so he can provide an affidavit by electronic means. According to Erie Insurance, FITZPATRICK has refused to sign an open-end authorization of release for Erie Insurance to collect financial documents as part of its investigation. FITZPATRICK was only willing to provide an authorization of release of his credit report. FITZPATRICK advised an Erie representative that he would be returning the documents in the next day or so by email.  On May 16, 2017, Lt. Matthews advised your affiant that in speaking with a representative from the Eric Insurance, he learned that FITZPATRICK submitted the forms regarding his claim via email on May 15, 2017, and the number on file for communications with FITZPATRICK is 410-707-5304.  FITZPATRICK communicated with

26

Erie Insurance using a phone assigned this call number as recently as March 16, 2017, to discuss his claim.

### Statements of Mikaila Fitzpatrick – April 7, 2017

55.     On April 7, 2017, investigators interviewed Mikaila Fitzpatrick in reference to property items and other information regarding the fire at the Emerald Court house. When shown a picture of a photo collage frame that was photographed at Linda Rabinovich's residence after the fire, Mikaila identified this item as a Christmas present she gave FITZPATRICK that he kept on the desk of his office at the Emerald Court house. When shown a picture of the Sonos sound system photographed at Ms. Rabinovich's residence after the fire, Mikaila stated that the sound system was previously installed at the Emerald Court house. Mikaila recognized several of the movies that FITZPATRICK brought to Ms. Rabinovich's house as those originally stored on a shelf at the Emerald Court house. Additionally, Mikaila advised that a photo collage in the letters "DAD" was a present she gave to her father and that she last saw this item on a shelf in the living room of the Emerald Court house in January 2017. This item was located at the Moneta Property by investigators after the fire. When presented with a photograph, Mikaila advised investigators that beads containing medals, awards and, membership cards recovered from the Moneta Property had previously been on a hook in her bedroom closet at the Emerald Court house. Mikaila advised that her father had approximately seven or eight trophies in the trophy case at the Emerald Court house. When asked if a trophy that was photographed at the Moneta Property at the time of the search warrant was normally kept there, Mikaila responded "no."

### Surveillance Operations

56.     On May 10, 2017, HCPD officers located Target Vehicle 2 in the parking garage attached to 10000 Town Center Avenue, where FITZPATRICK currently resides. On May 11,

27

2017, officers conducted surveillance operations on FITZPATRICK. FITZPATRICK was observed driving Target Vehicle 1 to a location to pick up landscaping supplies. Additionally, officers photographed Target Vehicle 1 in the parking garage of 10000 Town Center Avenue, which is accessible by keycard. Officers also observed FITZPATRICK walk from the stairwell that leads to that apartment complex into that garage on or about that same date.

57.     On May 14, 2017, aerial surveillance of the Target Address 1 was conducted and investigators confirmed that the previously mentioned detached garage/ pole barn and several trailers and vehicles were located on the premises of Target Address 1.

### Summary

58.     Based on the facts outlined above and other evidence gathered to date, there is probable cause to believe the Target Locations are being utilized by Michael FITZPATRICK to conceal and harbor evidence and information relevant to criminal violations listed in Paragraph 7 of this affidavit.

59.     Your affiant knows, based on her training and experience, that persons who are illegally in possession of firearms and ammunition, and are in the judicial process for such violations, move and/or arrange for the movement of firearms and ammunition they illegally own in order to conceal or disassociate themselves from such items.  I know that FITZPATRICK contacted at least one other individual to request that he remove several hundred rounds of ammunition from the Moneta Property.  Your affiant also knows, based on her training and experience, that persons who are involved in the destruction of buildings for purposes of submitting fraudulent insurance claims move and/or arrange for the movement of expensive, sentimental, and household items in order to avoid the destruction of these items.  I know that FITZPATRICK had vehicles moved out of a garage attached to the Emerald Court house and

28

had expensive furniture moved out of the house prior to the fire that destroyed the building. Additionally, according to witness statements, FITZPATRICK was engaged in packing items of property at the Emerald Court house.  Expensive and sentimental items normally maintained in the Emerald Court house were found in other locations, including the Moneta Property and the detached pole barn on the Target Address 1. There is further probable cause to believe that other items previously maintained in the Emerald Court house moved to other locations in advance of the fire, including an IMAC computer and various trophies that have not yet been located in the investigation. According to witness statements, FITZPATRICK has been in possession of a significant number of firearms and ammunition that have not been located or recovered in the investigation.

   60. Based on information obtained through the investigation to date, your affiant knows that the Target Locations remain available to FITZPATRICK for the storage of firearms, ammunition, expensive and sentimental items of property, ignitable or incendiary materials, insurance and other financial documents, and other evidence of the aforementioned crimes. I know that FITZPATRICK currently resides at Target Address 2, is receiving a supplement for his alternate living expense through Allstate, and is utilizing that address for communications with Allstate. I know that Target Vehicle 1 and Target Vehicle 2 were observed by police officers in a secure, keycard-accessible parking garage attached the apartment building where FITZPATRICK resides. I know that FITZPATRICK proffered to Allstate that his son's computer was lost or damaged in the fire at the Emerald Court house, yet investigators located this item undamaged in the detached garage/ pole barn on the premises of Target Address 1 the day after the fire was suppressed. (Investigators seek to seize this evidence and any other evidence stored in the pole barn pursuant to the requested warrant.)

USAO-000823

61.    Based on the facts outlined above and other evidence gathered to date, there is probable cause to believe that FITZPATRICK has used cell phones to communicate with co-conspirators, insurance companies, and others, and that such communications constitute evidence of the crimes listed in Paragraph 7 of this affidavit. Your affiant knows, based on her training and experience, that persons who are illegally in possession of firearms and ammunition, or are involved in the destruction of buildings for purposes of submitting fraudulent insurance claims, communicate with co-conspirators and others by telephone to arrange for the movement firearms, ammunition, and expensive and sentimental items of property, as described above. The requested warrants seek information contained in cell phones located in the Target Locations and assigned the call number 410-707-5304, including the Target Cell Phone, and communications made through these cell phones. This information will aid investigators in determining the current location of the aforementioned items and efforts made by FITZPATRICK and others to relocate or sequester this evidence. Your affiant also knows that FITZPATRICK has communicated with insurance companies using cell phones assigned the call number 410-707-5304, including the Target Cell Phone, to discuss his insurance claims and details surrounding the fire. Specifically, he has advised Allstate of false information about property destroyed in the fire, including his son's computer, and his own hospitalization. The requested communications will aid investigators in determining what information FITZPATRICK has conveyed to insurance companies in connection with fraudulent insurance claims.

62.    Based on the facts outlined above and other evidence gathered to date, there is also probable cause to believe that the prospective location information associated with the Target Cell Phone will disclose the location to which FITZPATRICK has moved and/or arranged for the movement of firearms, ammunition, and expensive or sentimental items of property. The

30

requested warrant for prospective location data seeks disclosure of information regarding the location of the Target Cell Phone that comes into the custody and control of Verizon Wireless during the 30-day time period following service of the warrant. Your affiant knows, based on training and experience, that persons who store in remote locations items of personal property that constitute evidence of criminal activity will travel to those locations to ensure the security of these items and to use them. Based on information gathered in the investigation, I know that FITZPATRICK has traveled to remote locations, including shooting ranges and the family farm of Mr. Weizman to use firearms and ammunition. There is probable cause to believe that the requested location information will disclose the location of firearms and ammunition stored by FITZPATRICK and locations where FITZPATRICK uses firearms and ammunition. There is also probable cause to believe that the requested location information will disclose the location of high-value, sentimental, and household items that were moved out of the Emerald Court house prior to the fire, including computers and trophies. The requested location information will also assist agents in tracking the patterns of FITZPATRICK and co-conspirators.

63.    Therefore, your affiant believes there is probable cause that search warrants for the aforementioned locations and information will aid investigators in obtaining relevant and material evidence in this ongoing criminal investigation.

64.    Your affiant anticipates seizure of the Target Cell Phone during search of the Target Locations, examining the Target Cell Phone at the scene of the search pursuant to the requested warrants, and returning the Target Cell Phone to FITZPATRICK so that location information can be collected by Verizon Wireless.

31

## CELLULAR TELPHONE SERVICES

65.     In my training and experience, I have learned that Verizon Wireless is a company that provides cellular telephone services to the general public, and that stored electronic communications, including retrieved and unretrieved voicemail, text, and multimedia messages, for Verizon Wireless subscribers may be located on computers in the custody and control of Verizon Wireless.

66.     Wireless phone providers often provide their subscribers with voicemail services. In general, a provider will store voicemail messages on behalf of a particular subscriber until the subscriber deletes the voicemail.  If the subscriber does not delete the message, the message may remain in the system of Verizon Wireless for weeks or months.(need to get this)

67.     Among the services commonly offered by wireless phone providers is the capacity to send short text or multimedia messages (photos, audio, or video) from one subscriber's phone or wireless device to another phone or wireless device via one or more wireless providers.  This service is often referred to as "Short Message Service" ("SMS") or "Multimedia Messaging Service" ("MMS"), and is often referred to generically as "text messaging." Based on my knowledge and experience, I believe that stored electronic communications, including SMS and MMS messages that have been sent or received by subscribers, may be stored by Verizon Wireless for short periods incident to and following their transmission.  In addition, providers occasionally retain printouts from original storage of text messages for a particular subscriber's account.

68.     Wireless phone providers typically retain certain transactional information about the use of each telephone, voicemail, and text-messaging account on their systems.  This information can include log files and messaging logs showing all activity on the account, such as

32

local and long distance telephone connection records, records of session times and durations, lists of all incoming and outgoing telephone numbers or e-mail addresses associated with particular telephone calls, voicemail messages, and text or multimedia messages. Providers may also have information about the dates, times, and methods of connecting associated with every communication in which a particular cellular device was involved.

69.    Wireless providers may also retain text messaging logs that include specific information about text and multimedia messages sent or received from the account, such as the dates and times of the messages. A provider may also retain information about which cellular handset or device was associated with the account when the messages were sent or received. The provider could have this information because each cellular device has one or more unique identifiers embedded inside it. Depending upon the cellular network and the device, the embedded unique identifiers for a cellular device could take several different forms, including an Electronic Serial Number ("ESN"), a Mobile Electronic Identity Number ("MEIN"), a Mobile Identification Number ("MIN"), a Subscriber Identity Module ("SIM"), an International Mobile Subscriber Identifier ("IMSI"), or an International Mobile Station Equipment Identity ("IMEI"). When a cellular device connects to a cellular antenna or tower, it reveals its embedded unique identifiers to the cellular antenna or tower in order to obtain service, and the cellular antenna or tower records those identifiers as a matter of course.

70.    Wireless providers also maintain business records and subscriber information for particular accounts. This information could include the subscribers' full names and addresses, the address to which any equipment was shipped, the date on which the account was opened, the length of service, the types of service utilized, the ESN or other unique identifier for the cellular device associated with the account, the subscribers' Social Security Numbers and dates of birth,

USAO-000827

all telephone numbers and other identifiers associated with the account, and a description of the services available to the account subscribers. In addition, wireless providers typically generate and retain billing records for each account, which may show all billable calls (including outgoing digits dialed). The providers may also have payment information for the account, including the dates, times, and places of payments and the means and source of payment (including any credit card or bank account number).

71.     In some cases, wireless subscribers may communicate directly with a wireless provider about issues relating to the account, such as technical problems, billing inquiries, or complaints from other users. Wireless providers typically retain records about such communications, including records of contacts between the user and the provider's support services, as well records of any actions taken by the provider or user as a result of the communications.

72.     As explained below, information stored at the wireless provider, including that described above, may provide crucial evidence of the "who, what, why, when, where, and how" of the criminal conduct under investigation. In my training and experience, the data pertaining to a particular cellular device that is retained by a wireless provider can indicate who has used or controlled the cellular device. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence. For example, data collected at the time of account sign-up, information relating to account payments, and communications (and the data associated with the foregoing, such as date and time) may indicate who used or controlled a cellular device at a relevant time. Further, such stored electronic data can show how and when the cellular device and associated cellular service were accessed or used. Such "timeline" information allows investigators to understand the chronological context

34

of cellular device usage, account access, and events relating to the crime under investigation. Stored electronic data may also provide relevant insight into the state of mind of the cellular device's owner and/or user as it relates to the offense under investigation. For example, information relating to the cellular device in the possession of the wireless provider may indicate the owner's motive and intent to commit a crime (e.g., communications relating to the crime), or consciousness of guilt (e.g., deleting communications in an effort to conceal them from law enforcement).

73.     Many wireless providers retain information about the location in which a particular communication was transmitted or received.  This information can include data about which cellular towers received a radio signal from the cellular device and thereby transmitted or received the communication in question.  Based on my training and experience, I know that Verizon Wireless can also collect cell-site data about the Target Cell Phone.

## AUTHORIZATION REQUEST

74.     Your affiant submits that there is probable cause to believe that FITZPATRICK is prohibited from possessing firearms and ammunition but has been and remains in possession of firearms and ammunition, in violation of 18 U.S.C. § 922(g).  There is further probable cause to believe that FITZPATRICK acted in concert and conspired with others in the use of fire to maliciously destroy residential and business property located at in Ellicott City, Maryland in order to submit fraudulent insurance claims by telephone and other electronic means, in violation of 18 U.S.C. §§ 844(h), 844(i), 844(m), 844(n), 1341, 1343, and 1349.  I submit further that there is probable cause that the requested search warrants for the Target Locations will reveal and result in the seizure of the Target Cell Phone; firearms and ammunition; high-value and household items of property removed from the Emerald Court house prior to the fire that

35

destroyed that building; financial, tax, and insurance-related documents and correspondence; ignitable or incendiary materials; and other evidence, fruits, and instrumentalities of the aforementioned criminal violations. I submit further that there is probable cause that the requested search warrant for communications made through the Target Cell Phone during the time period between December 30, 2016, and May 17, 2017, will reveal communications FITZPATRICK had with co-conspirators, insurance companies, and others that are relevant to the aforementioned criminal violations. I submit further that there is probable cause that the requested search warrant for prospective location information will reveal the location of additional evidence of the aforementioned criminal violations. Based on the foregoing, I request that the Court issue the proposed search warrants pursuant to Federal Rule of Criminal Procedure 41.

75.     This Court has jurisdiction to issue the requested search warrants for stored communications and prospective location information pursuant to 18 U.S.C. § 2703 because it is "a court of competent jurisdiction" as defined by 18 U.S.C. § 2711. Specifically, the Court is "a district court of the United States . . . that has jurisdiction over the offense being investigated." 18 U.S.C. § 2711(3)(A)(i). I anticipate executing these warrants by using the warrants to require Verizon Wireless to disclose to the government copies of the records and other information (including the content of communications and location information) particularly described in Section I of Attachment B-6 and Attachment B-7. Upon receipt of the information described in Section I of Attachment B-6, government-authorized persons will review that information to locate the items described in Section II of Attachment B-6. Pursuant to 18 U.S.C. § 2703(g), the presence of a law enforcement officer is not required for the service or execution of these warrants. I further request that the Court authorize execution of these warrants at any time of

36

USAO-000830

day or night, owing to the potential need to locate the Target Cell Phone outside of daytime hours.

## SEALING AND DELAYED NOTIFICATION

76.     I further request that the Court order that all papers in support of these applications, including the affidavit and search warrants, be sealed until further order of the Court. These documents discuss an ongoing criminal investigation that is neither public nor known to all of the targets of the investigation. Accordingly, there is good cause to seal these documents because their premature disclosure may seriously jeopardize that investigation.

77.     I further request, pursuant to 18 U.S.C. § 3103a(b) and Federal Rule of Criminal Procedure 41(f)(3), that the Court authorize the officer executing the warrant for cellular telephone communications and prospective location information to delay notice until 30 days after the collection authorized by the warrant has been completed. There is reasonable cause to believe that providing immediate notification of the warrant may have an adverse result, as defined in 18 U.S.C. § 2705. Providing immediate notice to the subscriber or user of the Target Cell Phone would seriously jeopardize the ongoing investigation, as such a disclosure would give that person an opportunity to destroy evidence, change patterns of behavior, notify confederates, flee from prosecution, and/or intimidate witnesses. *See* 18 U.S.C. § 3103a(b)(1). As further specified in Attachments B-6 and B-7, which is incorporated into the warrant, the proposed search warrant does not authorize the seizure of any tangible property. *See* 18 U.S.C. § 3103a(b)(2). Moreover, to the extent that the warrant authorizes the seizure of any wire or electronic communication (as defined in 18 U.S.C. § 2510) or any stored wire or electronic information, there is reasonable necessity for the seizure for the reasons set forth above. *See* 18 U.S.C. § 3103a(b)(2).

USAO-000831

_____

Clare A. Jeppi
Special Agent
Bureau of Alcohol, Tobacco, Firearms and Explosives

Subscribed to and sworn to me this ___18___ day of May, 2017

_____

The Honorable Beth P. Gesner
United States Magistrate Judge

38

USAO-000832

17 - 1 4 4 3 **BPG**

### ATTACHMENT A-1

### Property To Be Searched

11910 Emerald Court, Ellicott City, MD 21042 ("Target Address 1")



Target Address 1 was the scene of a fire that occurred on March 10 and March 11, 2017. The warrant authorizes a search of the fire scene and of various structures and vehicles located on the premises. According to real property databases, the property of 11910 Emerald Court ("Target Address 1") is approximately three (3) acres.

In the back of the Target Address 1 premises, at the bottom of the driveway is an outbuilding/ garage/ pole barn. The outbuilding/ garage/ pole barn that brown/grey is color, with vertically placed siding, and a garage door approximately 14 feet in height of the same color. To the left of the garage door is a set of white French doors that have glass panel inserts. There are several

other outbuildings, structures, vehicles and trailers on the property.

The Target Address 1 includes any structure or vehicle located on the premises, including but not limited to the following:

a.  the aforementioned outbuilding/ garage/ pole barn;
b.  large black/gray trailer, Maine registration #19TLR79720, VIN #564BEI628ER0049O8;
c.  smaller black trailer, VIN 542GJ4839EB007790; and
d.  red trailer, Maine registration #19TLR79721, VIN #5WKBE2423A1008679.

This warrant specifically authorizes the forcible entry of any locked structure, vehicle, container, or safe included in Target Address 1 for the purpose of searching for and seizing the items listed in Attachment B-1.

17 - 1 4 4 4 **BPG**

## ATTACHMENT A-2

### Property To Be Searched

Michael FITZPATRICK's current residence:
10000 Town Center Drive, Apartment #465, Columbia, Maryland 21044 ("Target Address 2")



Target Address 2 is an apartment located at 10000 Town Center Drive, Columbia, Maryland. After accessing the main door to the apartment complex, Target Address 2 is located on the 4th floor of the building. The door is cream/eggshell in color, surrounded with light blue trim. The door has a silver doorknob with a electronic deadbolt lock above the main door handle. In the middle of the door ¾ of the way towards the top is a peephole. To the right of the door is a silver plate with the numbers "465."

17-1443 **BPG**    17-1444 **BPG**    17-1445 **BPG**

## ATTACHMENTS B-1, B-2, B-3, B-4, and B-5

17-1446 **BPG**

### Items To Be Seized

The locations described in Attachments A-1, A-2, A-3, A-4, and A-5 may be searched for the following items, which may be searched and seized:

All records, documents, messages, correspondence, data, and materials that may constitute fruits or instrumentalities of, or contain evidence related to, violations of 18 U.S.C. § 922(g) (possession of firearms and ammunition by a prohibited person); 18 U.S.C. §§ 1341, 1343, and 1349 (mail fraud, wire fraud, and related conspiracy); 18 U.S.C. § 844(h),(m) (use of fire to commit a federal felony and related conspiracy); and 18 U.S.C. § 844(i),(n) (malicious destruction of property by fire and related conspiracy), including the following:

1.      Any and all U.S. currency and financial records;

2.      Any and all books, records, and documents including but not limited to appointment books, diaries, calendars, work schedules, phone numbers, email addresses, and real property addresses;

3.      Any and all cell phones, PDAs, smart phones, or tablets;

4.      Any and all photographs, including still photos, negatives, video recordings, films, undeveloped film and the content therein, slides, including but not limited to photographs of controlled dangerous substances;

5.      Any and all records, documents, and materials pertaining to identification, including but not limited to: birth certificates; driver's licenses; photo identification cards; passports; Social Security cards; and any use or application for these items;

6.       Any and all receipts for packages or letters sent or received via Federal Express, United States Postal Service, United Parcel Service or similar companies;

7.      Any and all firearms, ammunition, firearms parts, components, correspondence, books, manuals, or packaging;

8.      Any ignitable and/or incendiary materials or liquids;

9.      Any and all books, records, documents, and other items related to or memorializing the purchase, sale, transfer, transportation, storage, packaging, and use of firearms, ammunition, including but not limited to sales, log books, ledgers, telephone and address books, rolodexes, telephone answering pads, bank and financial records, records relating to domestic and foreign travel such as tickets, passports, visas, credit card receipts, travel schedules, receipts and records, trucker log books and storage records, such as storage locker receipts and safety deposit box rental records;

17-1447 **BPG**

10.     Any and all of the above mentioned books, records, documents, and other items reflecting names, addresses, telephone numbers, pager numbers, fax numbers, and/or telex numbers of possible co-conspirators, sources of supply, customers, financial institutions, and other individuals or businesses with whom a financial relationship exists;

11.     Any and all articles of personal property documenting or evidencing the existence of conspiracies to commit arson and/or insurance fraud;

12.     Any and all articles of property documenting or evidencing the purchase, sale, possession, transfer, transport, storage, package, and use of firearms, ammunition, including but not limited to tools for manufacture;

13.     Any and all photographs, including still photos, negatives, video recordings, films, undeveloped film and the content therein, slides, including but not limited to photographs of firearms, ammunition, and personal items from the house previously located at 11910 Emerald Court, Ellicott City, Maryland or photographs of said address;

14.     Any and all safes, locked boxes, cardboard firearm boxes and other receptacles that could contain firearms, ammunition, serial numbers and/or currency;

15.     Any and all articles of personal property evidencing or containing the evidence of the obtaining, secreting, transfer, expenditure and/or the concealment of money and assets derived from committing the crime of arson and/or insurance fraud, or to be used in the sale of firearms and/or ammunition, including books, receipts, records, bank statements and records, business records, money drafts, money orders, wire transfer receipts, and cashier's check receipts, passbooks, bank checks, safes, records of safety deposit boxes and storage lockers;

16.     Any and all proceeds and articles of personal property which are the fruits, instrumentalities, and evidence of possession of firearms and/or ammunition, and the crime of arson and/or insurance fraud, including currency, precious metals and stones, jewelry, negotiable and financial instruments;

17.     Any and all articles of personal property or which bear sentimental value which are the fruits, instrumentalities, and evidence of committing the crime of arson and/or insurance fraud; including, but not limited to trophies, awards, certificates, photographs, artwork, furniture, household items, items associated with racing and/or the purchase of race cars and/or other vehicles, and/or items which have been moved from the house previously located at 11910 Emerald Court, Ellicott City, Maryland to this location in an effort to elude law enforcement or insurance investigators;

18.     Indicia of occupancy, residency, rental, ownership, and/or use of the premises described herein including but not limited to utility bills, rental, purchase or lease agreements, and keys;

19.     Any and all computers, and/or electronic equipment, including but not limited to the following:

a)     Any and all information and/or data stored in the form of magnetic or electronic coding on computer media or on media capable of being read by a computer or with the aid of computer related equipment. This media includes network, servers, back-up tapes and diskettes, hard drives, thumb drives, flash drives, zip drives, floppy diskettes, fixed hard disks, removable hard disk cartridges, tapes, laser disks, video cassettes and other media capable of storing magnetic coding;

b)     Any and all cellular telephones, smart phones, personal digital assistants (PDAs), pagers, thumb drives, and other electronic storage devices that may contain information;

c)     Any and all electronic devices which are capable of analyzing, creating, displaying, converting or transmitting electronic or magnetic computer impulses or data, including computers, computer components, computer peripherals, word processing equipment, modems, monitors, printers, plotters, encryption circuit boards, optical scanners, external hard drives and other computer related devices; and

d)     Any and all instruction or programs stored in the form of electronic or magnetic media, which are capable of being interpreted by a computer or related components. The items to be seized could include operating systems, application software, utility program, compilers, interpreters, and other programs or software used to communicate with computer hardware peripherals whether directly or indirectly via telephone lines, radio, or other means of transmission.

20.     The search procedure of the electronic data contained in computers, operating software, memory devices, and other equipment identified in paragraph 18, whether performed on site, in a laboratory, or in another controlled environment, may include the following techniques:

a)     Surveying various file "directories" and the individual files they contain (analogous to looking at the outside of a file cabinet for the markings it contains and opening a drawer believed to contain pertinent files);

b)     "Opening or cursorily reading the first few "pages" of such files, in order to determine their precise contents;

c)     "Scanning" storage areas to discover and possibly recover recently deleted data; or

d)     Performing key word or other search and retrieval searches through all electronic storage areas to determine whether occurrences of language contained in such storage areas exist that are intimately related to the subject matter of the investigation.

USAO-000843

21.    Any and all documents indicating ownership of vehicles, conveyances, other properties, storage units, or other locations associated with Michael FITZPATRICK or possible co-conspirators.