## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

**IN THE MATTER OF THE SEARCH OF**

**Information associated with (410) 274-4522 that is stored by Verizon Wireless**

**Information associated with (325) 370-3246 that is stored by AT&T Wireless**

**Google account associated with Mike.rmf@gmail.com**

**AND THE TRACKING OF**

**Prospective location information for the cell phone using (410) 274-4522 that is obtained by Verizon Wireless**

**Prospective location information for the cell phone using (325) 370-3246 that is obtained by AT&T Wireless**

**Case No.** 18- 2640 BPG
18- 2641 BPG
18-2642 BPG
18-2643 BPG
18-2644 BPG

**Filed Under Seal**

## AFFIDAVIT IN SUPPORT OF APPLICATION
## FOR SEARCH AND SEIZURE WARRANTS

Your affiant, Clare Jeppi, Special Agent with the United States Department of the Justice, Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF), submits this affidavit in support of a search warrant for the locations further described in Attachments A-1, A-2, A-3, A-4, and A-5, for the items identified in Attachments B-1, B-2, B-3, B-4, and B-5.

1.      Your affiant has personally participated in the investigation set forth below. Your affiant is familiar with the facts and circumstances of the investigation through her personal participation; from discussions with investigators of the Howard County Police and Fire Departments, the Office of the Fire Marshal, and other law enforcement and fire officials;

1

USAO-000519

from information obtained through law enforcement interviews of witnesses with knowledge of certain information related to this investigation; and from her review of records, reports, video surveillance recordings, and other evidence relating to the investigation.    Since this affidavit is being submitted for the limited purpose of securing search warrants, your affiant has not included details of every aspect of the investigation.    Rather, your affiant set forth only those facts that she believes are necessary to establish probable cause.    The information contained in this affidavit is based upon your affiant's personal knowledge, her review of documents and other evidence, and her conversations with other law enforcement officers and other individuals.

   2. This affidavit is made in support of applications for search warrants under Title 18, United States Code, Sections 2703(a), 2703(b)(1)(A) and 2703(c)(1)(A) to require Verizon Wireless and AT&T Wireless to disclose to the government records and other information in its possession pertaining to the user of the cell phone numbers (410) 274-4522 and (325) 370-3246 (the "Target Cell Phones"), respectively, and to require Google Inc. to disclose to the government records and other information in its possession pertaining to the user of the email address Mike.rmf@gmail.com. The information to be disclosed includes the contents of communications (as further described in Attachments B-1, B-2, and B-3) and the locations of the Target Cell Phones (as further described in Attachment B-4 and B-5).

   3. Your affiant is an "investigative or law enforcement officer of the United States" within the meaning of Title 18, United States Code, Section 2510(7), that is, an officer of the United States who is empowered by law to conduct investigations of and to make arrests for offenses enumerated in 18 U.S.C. § 2516.

   4. Your affiant knows, pursuant to Title 18, United States Code, Section 844(i),(n), that it is unlawful for any person to maliciously damage or destroy by means of fire any building

2

or vehicle used in interstate or foreign commerce or in any activity affecting interstate or foreign commerce, or to conspire with others to do so.

5.      Your affiant knows, pursuant to Title 18, United States Code, Section 844(h),(m), that it is unlawful for any person to use fire to commit any felony that may be prosecuted in federal court, or to conspire with others to so.

6.      Your affiant knows, pursuant to Title 18, United States Code, Sections 1343 and 1349, that it is unlawful for any person to transmit or cause to be transmitted by means of wire, radio, or television communication in interstate or foreign commerce, any writings, signs, signals, pictures, or sounds for the purpose of executing a scheme or artifice to defraud, having devised or intended to devise such a scheme, or to conspire with others to do so.

7.      Your affiant knows, pursuant to Title 18, United States Code, Section 922(g), that it is unlawful for any person who has been convicted of a crime punishable by imprisonment for a term exceeding one year, to possess in or affecting interstate commerce, any firearm or ammunition, or to receive any firearm or ammunition which has been shipped or transported in interstate or foreign commerce.

8.      Based upon your affiant's training and experience, participation in this and other arson and firearms investigations, as well as her conversations with other agents, your affiant knows the following:

a.      Persons who commit or conspire to commit arson often do so to collect on fraudulent insurance claims and will remove items of value, both financial and sentimental (such as computers, electronics, expensive vehicles, family photographs, awards, certificates, furniture, and other household items) from the property to be destroyed, and will do so to alleviate personal or commercial debt;

3

USAO-000521

b.      Persons who commit or conspire to commit arson for profit or to defraud, or have knowledge of such acts, will use cellular telephones, e-mail, and other means to communicate with other persons (including co-conspirators, family members, or associates) and businesses regarding acts in furtherance of their crimes, such as the location and movement of items of personal property, insurance claims, and compensation for involvement in the fraud scheme;

c.      Persons who commit or conspire to commit arson for profit or to defraud, or have knowledge of such acts, often maintain in paper files and electronic storage media, financial records and financial instruments related to their crime and the profits derived from those acts and transactions, including, but not limited to, currency, bank checks, cashier's checks, Western Union receipts, money orders, stocks, bonds, precious metals, and real estate records;

c.      Persons who commit or conspire to commit arson for profit or to defraud, or have knowledge to such acts, maintain in paper files and electronic storage media, records of their financial transactions, including, but not limited to, books, ledgers, records and other documents relating to their residences, businesses, bank accounts, credit cards, tax records, and financial correspondence. Such documents are frequently stored where the offenders have ready access to them, including in their homes and vehicles;

d.      Persons who commit or conspire to commit arson for profit or to defraud, or have knowledge of such acts, commonly maintain books, records and other documents that identify and contain the names, addresses and/or telephone numbers of associates in their fraud or criminal activities, in locations including, but not limited to, address books, telephone books, rolodexes, telephones or personal digital assistants with stored information, notes reflecting

4

telephone numbers, photographs (to include still photos, negatives, movies, slides, video tapes, digital video discs, undeveloped film, memory cards, and digital image and video files), computers, tablets, cell phones, and other digital electronic devices;

      e.     Persons who commit or conspire to commit arson for profit or to defraud, or have knowledge of such acts, commonly maintain identification and travel documents, including, but not limited to, tickets, transportation schedules, passports, notes and receipts related to travel, and motel/hotel receipts;

      f.     Persons who commit or conspire to commit arson for profit or to defraud, or have knowledge of such acts, typically store or maintain indicia of occupancy, residency and/or ownership of the premises and/or vehicles to be searched, and are often present in such premises;

      g.     Persons who possess firearms and ammunition but are prohibited by law from doing so typically store firearms, ammunition, and firearms parts and components inside combination or key lock safes or strong boxes, suitcases, locked cabinets and other types of locked or closed containers, or hidden compartments, which are secreted in locations where they may keep these items secure, concealed, or otherwise inaccessible to law enforcement; and

      h.     Information regarding cellular towers and sectors utilized by cellular telephones and other information obtained by cellular telephone service providers as cellular telephones are being used (including sending and/or receiving radio signals) reveal and can be analyzed by law enforcement to establish the locations of these cellular telephones so that they may be seized and searched.

## BACKGROUND AND EXPERIENCE

9.     Your affiant has been a Special Agent for the ATF since February 2000. In April

5

USAO-000523

2000, your affiant attended the Criminal Investigator Training Program at the Federal Law Enforcement Training Center in Glynco, Georgia, where your affiant was taught and trained in the fields of criminal law, constitutional law, and federal court procedures.  In the summer of 2000, your affiant attended the New Professional Training Program at the Federal Law Enforcement Training Center in Glynco, Georgia and was specifically trained in the fields of arson, explosives, and federal firearms laws and violations.  Prior to this, from May 1996 until February 2000, your affiant was an Immigration Agent for the United States Immigration and Naturalization Service in Philadelphia, Pennsylvania. For this position, your affiant attended the Immigration Officer Basic Training Course at the Federal Law Enforcement Training Center, and was also taught and trained in the areas of federal criminal law and violations.

10.    From the time your affiant returned from ATF training at the Federal Law Enforcement Training Center in September 2000, until the present day, your affiant has been assigned to ATF's Baltimore Field Division to conduct and assist investigations involving firearms, narcotics, arson and explosives. Throughout most of her tenure as a Special Agent in the Baltimore Field Office, your affiant has been assigned to several enforcement groups in Baltimore and Prince George's Counties, in which the primary focus of these investigations was firearms and narcotics trafficking. Your affiant has served as the case agent for numerous investigations that have included adopted firearms cases from state and local agencies as well as more complex investigations involving illegal firearms possession, armed narcotics traffickers, and burglaries of Federal Firearms Licensees (FFLs). Your affiant has worked with several informants who engaged in controlled narcotics and firearms purchases for the purpose and support of these investigations. Your affiant has been responsible for the control and handling of informants and witnesses, monitoring controlled purchases or "buys," and collecting the

6

evidence subsequent to these purchases. Your affiant has also participated in several arson and explosives investigations since her tenure began with the ATF. In or about 2015, your affiant was assigned to the Baltimore Field Division's Arson & Explosives Group whereby your affiant has been appointed to serve as the case agent or participant on several investigations under those purviews. Your affiant's experience in the Baltimore Field Division's Arson & Explosives Group has included supervisory roles within the group, fire scene processing, evidence collection, witness interviews, and other investigative tools in support investigations involving arson and explosives. Your affiant's testimony has been accepted by the courts of the United States of America and has resulted in convictions of persons for violations of federal laws.

11.     Additionally, your affiant was certified in September 2017 as a Mobile Extraction Technician (MET) for the Bureau of Alcohol, Tobacco Firearms & Explosives, whereby she has personally extracted the data from numerous cell phones and electronic storage items pursuant to legal process. Your affiant knows in her tenure as a law enforcement officer and as a certified MET that there is retrievable data on cell phones, to include deleted files, which could prove pivotal to an investigation. Additionally in her experience as a MET, your affiant has consulted with law enforcement officers who have analyzed the extracted data, which revealed text messages, photographs, applications, and other evidence of criminal activity. Your affiant has personal knowledge as to the data that can be stored on cell phones, and the items that can be retrieved in support of the investigation.

## RELEVANT FACTS/PROBABLE CAUSE

The following circumstances are offered as probable cause:

### Fire at Emerald Court Property and Statements of Michael Fitzpatrick

12.     On March 10, 2017 at approximately 2355 hours, Howard County 911 received

USAO-000525

multiple calls reporting a fire at 11910 Emerald Court, Ellicott City, Howard County, Maryland 21042 (the "Emerald Court Property").  Responding firefighters encountered a single family home fully engulfed in flames.  The cause of the fire is undetermined at this time.  The structure was deemed uninhabitable.    Michael Fitzpatrick ("Fitzpatrick") was identified as the homeowner.  This information was verified through Maryland Department of Assessments & Taxation - Real Property.  A short time after the fire, Fitzpatrick arrived at the scene and was interviewed by investigators.  Fitzpatrick was utilizing crutches and had a cast on his left leg.  He advised that he recently had surgery on his foot on March 9, 2017.

13.    Howard County Police Detective Marc Delbusso interviewed Fitzpatrick while at the scene of the fire. Fitzpatrick stated that he left the residence on March 9, 2017 at approximately 0930 hours for his scheduled surgery.  Subsequent to his surgery, he was picked up by his fiancé, Linda Rabinovich.  Due to the surgery, and for his recovery, Fitzpatrick made arrangements with Rabinovich to stay at her home for approximately one week (7 days). Fitzpatrick denied having any major problems with his home but did advise that the circuit breaker would "trip" in his home office.  Fitzpatrick believed it may have to do with the use of his printer, and stated this "tripping" activity would happen approximately once a week. Fitzpatrick owns three dogs of which he dropped off two at his ex-wife's (Allison Fitzpatrick) home to care for them during his surgery, and the third dog was brought to Rabinovich's residence.

14.    Fitzpatrick stated that he had a Nest Thermostat (Wi-Fi) and Nest Smoke Detector (Wi-Fi) installed in his home, the scene of the fire. (Your affiant knows that Nest Labs is a home automation producer of programmable and Wi-Fi-enabled thermostats, smoke and carbon monoxide detectors, and other security systems, including Nest Thermostat and Nest Protect.

8

Nest Labs also provides an application for use on mobile electronic devices that allows users to operate and monitor Nest systems remotely.)  Fitzpatrick voluntarily showed investigators his cell phone screen, which displayed the Nest application, and, as he handed his phone to investigators, he expressed confusion and advised police he was unsure of how to utilize the application. Investigators noted a message displayed on March 10 that read: "Offline." When the "Offline" message was accessed, investigators noted the system went "Offline" at approximately 1900 hours, approximately five hours before the fire.

15.     As the interview continued, Fitzpatrick voluntarily drew a sketch of the interior of his home.  This sketch included his home office, where he advised his printer would sometimes cause the breaker to trip, and advised the printer was plugged into a power strip that was plugged into a wall outlet.  Fitzpatrick asked about the status of his cars; however, he never asked or commented regarding the status of any other items in his home.

16.     On March 12, 2017, Detective Delbusso interviewed Fitzpatrick at Rabinovich's home.  At that time, Fitzpatrick gave investigators written consent to access his trailers and detached garage.   While speaking with Detective Delbusso, Fitzpatrick asked, "Was it electrical?"  Detective Delbusso asked Fitzpatrick to show him his Nest (Wi-Fi Thermostat) application on his cell phone.  Fitzpatrick voluntarily complied.  Detective Delbusso noticed there was no longer an "Offline" message as previously viewed.

### Consent Search of Trailers and Detached Garage at Emerald Court Property

17.     Later that evening, and pursuant to the consent search, Detective Delbusso and other investigators located a computer (tower unit), printer, and computer monitor in the detached garage (pole barn) to the rear of the property at the Emerald Court Property.  These items were not set up, connected, or receiving power, and they were located on the cement floor

9

to the rear of the detached garage. The outbuilding was not set up for an office.

18.     Detective Delbusso received consent from Fitzpatrick to search his trailer that was parked on the driveway towards the back of the house, and in front of the aforementioned detached garage. A search of the trailer resulted in the recovery of a manufactured AR-15 style rifle, having a Juggernaut Tactical Model JT-15 lower receiver. Also located in the trailer was a shipping box with a shipping label affixed to the top addressed to Michael Fitzpatrick at the Emerald Court Property, containing several smaller boxes of TulAmmo .223 rounds of ammunition.

### Jonathan Weizman

19.     On March 13, 2017, your affiant interviewed Jonathan Weizman ("Weizman"), an employee at Fitzpatrick's business, who advised that the firearm recovered on March 12, 2017, was his, and he built the firearm with a tool located in Fitzpatrick's garage. Weizman provided a written statement attesting to this, but also advised that he and Fitzpatrick had an agreement that if he (Weizman) built the firearm and Fitzpatrick purchased the ammunition, Fitzpatrick could shoot the firearm. Weizman added in his statement that he and Fitzpatrick have gone shooting with that firearm in Moneta, Virginia during race weekends. (It is important to note that, during a previous interview on March 12, 2017, Weizman advised your affiant and ATF Special Agent Daniel Giblin that he and Fitzpatrick would spend the night at Fitzpatrick's lake house in Moneta, Virginia (the "Moneta Property") on weekends they would go to the racetrack.)

20.     Weizman's cell phone number is 410-274-4522, and the cell service provider is Verizon Wireless. Information received from the phone company pursuant to legal process obtained in June 2018 revealed that the subscriber for this phone number is Shachar Weizman,

USAO-000528

who investigators believe is Weizman's father. The address associated with the phone number is the address where the aforementioned interview of Weizman took place on March 12, 2017.

21.    A review of phone records reviewed and analyzed between Weizman and Fitzpatrick reveal a routine exchange of communications on a consistent basis for months leading up to the fire. On March 9, 2017, the day before the fire, Weizman and Fitzpatrick share several communications throughout the day, the last communication taking place at the time recorded by the cell phone carrier as 20:37. Subsequently, on March 10, 2017, per the call detail records, communications resume at 06:54. Communications end at approximately 07:37 and resume at 13:25 hours. According to phone records, communications (both voice and text) between Weizman and Fitzpatrick continue throughout the day and cease at approximately 20:06 hours. Communications resume on March 11, 2017, with an incoming call from Fitzpatrick to Weizman at 00:26 hours. According to investigator interviews with Fitzpatrick and Weizman, Fitzpatrick contacted Weizman to pick him up and take him to the Emerald Court Property after he learned of the fire. On that same date, at approximately 01:45 hours, Fitzpatrick texts Weizman several times. According to call detail records, communications do not resume between Fitzpatrick and Weizman until approximately 16:58 hours on March 11, 2017. On March 12, 2017, carrier records reveal that communications begin at 08:51 hours and continue until 10:39 hours. (Investigators interviewed Weizman at this residence regarding the fire at approximately 11:12 hours.)

22.    An extraction of cell phone data pursuant to a search warrant executed on Fitzpatrick's phone seized subsequent to the fire revealed a partial communication or text message string in which Fitzpatrick and Weizman discuss the use of Signal—a mobile application (app) that permits encrypted communications. According to the text message string,

11

USAO-000529

at 8:51 a.m., Fitzpatrick suggests to Weizman "let's switch to signal." This text communication appears on call detail records obtained by law enforcement. Subsequently, on March 12, 2017, at approximately 1:03 p.m., Weizman texts Fitzpatrick, "Everything went fine." (For information and context, investigators ended the interview with Weizman at approximately 11:52 hours on that date.) On that same date at 4:22 p.m. (the time indicated on the text message string), Fitzpatrick sends Weizman a text, "Looks like they are sitting in front of neighbors house?" Through subsequent communications, Fitzpatrick and Weizman discuss the presence of the police outside at what investigators believe to be the time they were surveilling Linda Rabinovich's residence. The communication also included the type of car driven by an investigator at that time. Subsequently, through what investigators believe to be additional encrypted communications, Fitzpatrick asks Weizman, "where is the shotgun?" Communications continue with a communication at 6:15 p.m. whereby Fitzpatrick tells Weizman, "Let's not bring up the lake if possible." This communication is not evident on call detail records from the carrier, leading investigators to believe it was also a portion of encrypted communications. (As detailed below, investigators learned that Fitzpatrick moved several items formerly inside the Emerald Court residence to his secondary residence at Smith Mountain Lake in Moneta, Virginia (the "Moneta Property"), which family members describe as "the lake house.")

23.     According to the Maryland Motor Vehicle Administration, a 2003 White Chevrolet truck bearing Maryland registration 4CH3380 is registered to Weizman. The vehicle is registered to Weizman at the residential address 7400 Travertine Drive, Unit 207, Baltimore, Maryland 21209. (Investigators interviewed Weizman at this residential address on March 12, 2017.)

**Bryan Hardaway**

12

24.    On March 13, 2017, in an interview with law enforcement, Bryan Hardaway ("Hardaway") provided a statement. Hardaway was residing in a mobile home on the back of the Emerald Court Property. He advised that he was living there in exchange for some work that he did on Fitzpatrick's car. Hardaway stated further that during the time of the fire, he was at a bowling alley in Columbia, Maryland with his friend Cassie Kelly. Furthermore, according to his statement, he advised investigators that on March 10, 2017, he drove home from work and returned to his camper at approximately 7:30 p.m. He stated he changed clothes, spoke to his parents on the phone, and left the camper at approximately 8:30 -8:45 p.m. to go to the bowling alley with Kelly. (Investigators have determined that the internet service to the Emerald Court residence terminated at approximately 20:48 hours, or 8:48 p.m.)

25.    Through legal process and others aspects of the investigation, it was learned that Hardaway utilizes and operates the cell phone number 325-370-3246 (also associated with who investigators believe is his father, Michael Hardaway), and the cell service provider is AT & T. Additionally, on August 30, 2018, your affiant utilized a universally accepted law enforcement index that attributed the phone number to Bryan Hardaway with a Texas address as recent as August 2018. This address coincided with the address associated with Hardaway in the Texas Department of Motor Vehicles records as of August 30, 2018, confirming the records were current and associated with the same person.

26.    Call detail records obtained though legal process on Hardaway's cell phone show there are no calls or communications between Hardaway and the phone number used by Kelly on March 10, 2017, which one would expect had Hardaway and Kelly made arrangements to go to a bowling alley together that night. In fact, phone records reveal that, in the month of January 2017, there were over 50 phone contacts between Hardaway and Kelly, there were

13

approximately ten phone contacts between Hardaway and Kelly in February 2017, and there were less than five phone contacts between Hardaway and Kelly in March 2017, all taking place on March 25, 2017.

27.    A review of the phone records reveal that Hardaway and Fitzpatrick communicated almost daily by phone in the beginning of March 2017. On March 9, 2017, Hardaway and Fitzpatrick exchange several communications, the last call taking place at approximately 21:30 hours and lasting approximately six minutes. Phone records do not reveal any communications between Hardaway and Fitzpatrick on March 10, 2017 (the day of the fire), and communication resumed on March 11, 2017, at approximately 00:46 hours with an outgoing call from Fitzpatrick to Hardaway lasting approximately 27 seconds.

28.    According to the Maryland Motor Vehicle Administration, a 2018 dark colored Chevrolet truck bearing Maryland registration 8DC1360 is registered to Hardaway and a co-signer Michael Hardaway (who investigators believe is Hardaway's father). The vehicle is registered to Hardaway at the residential address 11513 Crowsnest Road, Clarksville, Maryland 21029.

## Interstate Nexus

29.    Your affiant reviewed a certified copy of Fitzpatrick's criminal history and consulted with counsel to confirm that Fitzpatrick is prohibited from possessing firearms and ammunition because he was found guilty of a crime punishable by a term exceeding one year.

30.    A consultation with ATF Special Agent David Collier, who also serves as an interstate nexus expert, confirmed that the Tulammo ammunition seized from Fitzpatrick's trailer, and subsequently confirmed by Fitzpatrick as having ordered and owned it, is manufactured outside the state of Maryland, thereby affecting interstate commerce.

USAO-000532

31.    After the original interview with Fitzpatrick, and at the onset of scene processing, it was learned that the residence located at the Emerald Court Property was also used as Fitzpatrick's commercial business location.  Fitzpatrick's business, RMF Inc., specialized in landscaping and snow removal, and investigators learned via witness statements that Fitzpatrick operated his business out of his home office.  Several large trucks with the RMF logo/placard were located in the driveway of the residence, as well as snow removal equipment, tools, construction vehicles and supplies.  Your affiant witnessed workers arrive at the Emerald Court Property two days after the fire, equip the company trucks with supplies, and leave for job sites. Investigators learned through interviews with neighbors that Fitzpatrick was called to court and county meetings in reference to the noise produced by the commercial vehicles.  Public records indicate, and Fitzpatrick confirmed in his post-Miranda interview, that he had applied for a variance with the county for the use of his property as a commercialized zone, and he had a meeting with local representatives in reference to the variance the Wednesday before the fire. Your affiant reviewed public records for Howard County in which Fitzpatrick was assigned a case for said variance in which he cited the Emerald Court Property as conditional use of a home-based contractor.    Additionally at the time of this writing, according to the Maryland Judiciary case search, Fitzpatrick was summoned by the state for violations stemming from the illegal use and presence of commercial vehicles in a residential area on the Emerald Court Property.

**Information from Nest Labs and Verizon**

32.    Pursuant to legal process, investigators obtained information from Nest Labs regarding the Nest thermostat and unit installed inside the Emerald Court residence.  Information obtained revealed that the Nest thermostat and smoke alarm system produced an infrared motion

15

detector log on March 10, 2017, at approximately 22:20 hours UTC, , and the Nest unit power log was last registered at approximately 23:30 hours UTC. . (The fire department was called to the scene at approximately 23:55 hours on March 10, 2017, three hours after these readings.) Through legal process, it was learned that Fitzpatrick's Nest user account and profile included the email address mike.rmf@gmail.com.

33.     Records received from Verizon pursuant to legal process reveal that the Verizon internet service to the Emerald Court Property stopped on March 10, 2017, at approximately 20:48 hours EST.

### Statements of Allison Fitzpatrick on March 11, 2017

34.     On March 11, 2017, Howard County Police Detective Scott Heaster interviewed Allison Fitzpatrick, Fitzpatrick's ex-wife. Ms. Fitzpatrick advised, among other things, that the couple owned a vacation home in the Smith Mountain Lake area in Virginia when they were married and provided the address to the police as 300 Indian Ridge Drive, Moneta, Virginia 24121 (the "Moneta Property"). Ms. Fitzpatrick advised the detective of how the transaction occurred that ultimately turned the Moneta Property over to Fitzpatrick after their divorce and called this home the "stolen" house because of the trickery she claimed occurred. Additionally, she advised Detective Heaster that Fitzpatrick had brought her a dresser from the residence on Emerald Court a few weeks ago and, when he did, he dropped off a large stack of family photographs from the residence on Emerald Court. Ms. Fitzpatrick found this odd due the two of them arguing over the photographs when they were going through the divorce.

### Statements of Linda Rabinovich on March 13 and 14, 2017

35.     On March 13, 2017, Linda Rabinovich (Fitzpatrick's fiancé) contacted Detective Delbusso. She advised she was very concerned about items she recently discovered in her home

16

belonging to Fitzpatrick. Rabinovich advised Detective Delbusso that she was cleaning out a closet (located in computer room/home office), and she does not regularly use the closet in question. She located additional clothing belonging to Fitzpatrick, which surprised her because Fitzpatrick was only supposed to stay at her home for about a week after his surgery. Rabinovich grew more suspicious and looked around the office where Fitzpatrick had set up his work computers for the week. Rabinovich photographed a "spreadsheet-style" document on Fitzpatrick's computer which displayed some of Fitzpatrick's financial liabilities and outstanding bills. Based on the information on the spreadsheet, it appeared that Fitzpatrick owes approximately $1,000,000 to various creditors. Rabinovich located a black folder with Fitzpatrick's initials on the front containing sentimental pictures of Fitzpatrick's children when they appeared to be approximately 8 to 10 years old and handmade holiday cards from his children that appeared to be several years old. Rabinovich located a bill from the Internal Revenue Service (IRS) revealing that Fitzpatrick owed over $118,000 as well as multiple computers and related equipment, including a tower unit, tablet, portable external hard drive, tower unit hard drive, and SD cards.

36. On March 14, 2017, Detectives from the Howard County Police Criminal Investigations Section and your affiant responded to Linda Rabinovich's residence per her request. Rabinovich provided a recorded statement regarding her relationship with Fitzpatrick, and certain events she recently questioned involving Fitzpatrick. Rabinovich advised that on March 11, 2017, she witnessed Fitzpatrick receive a phone call from Allstate Insurance regarding a fire insurance claim. Rabinovich described Fitzpatrick as having "fake tears" when speaking with the Allstate representative. Rabinovich also questioned certain activities and behaviors exhibited by Fitzpatrick months before the fire that were suspicious to her. For example,

USAO-000535

Fitzpatrick removed his home television and took it to Rabinovich's home, although her television is functioning properly. Fitzpatrick removed a large amount of bakeware or cookware from his home and gave it to Rabinovich, although she stated she had no need for these items. Fitzpatrick removed his home wireless speaker sound system and brought it to Rabinovich's home. Rabinovich advised she did not request any of the above listed items from Fitzpatrick. Rabinovich recalled a time before the fire occurred that she and Fitzpatrick went on a walk around the neighborhood and commented on a home that she thought was beautifully built but had unsavory colors. She advised that Fitzpatrick asked her if they were to build a home, what colors would she like the home to have. Rabinovich did not find the question odd at the time, but in light of recent events, she advised the investigators of this conversation. Additionally, Fitzpatrick brought over several large-screen computer monitors, files and documents, along with men's suits, movies and other items inconsistent with short stay for recovery following surgery.

37.    Rabinovich also advised investigators that she went to the gun range with Fitzpatrick on various occasions. She advised that Fitzpatrick brought several firearms with him, including long guns and handguns, which were in the trunk of his car. Rabinovich added that Fitzpatrick brought the ammunition with him that corresponded to the firearms he brought. She added that she and Fitzpatrick shot the guns at stuffed animals and water bottles.

**Statements of Michael Fitzpatrick on March 14, 2017**

38.    On March 14, 2017, Fitzpatrick was arrested for illegally possessing a regulated firearm and ammunition, in reference to the aforementioned recovery from Fitzpatrick's trailer. After he was transported to a Howard County police station and advised of his Miranda rights, Fitzpatrick agreed to speak with your affiant and Detective Delbusso. At the onset of the

18

USAO-000536

interview, and advising him of his prohibited status and reason for arrest, Fitzpatrick ultimately admitted to shooting the firearm at a range and purchasing the ammunition that was recovered from his trailer. Fitzpatrick denied shooting several different types of firearms as indicated by Rabinovich. Fitzpatrick advised that he researched the legality of purchasing ammunition but was unaware of the fact that his prohibited status applies to ammunition. He also advised that he was attempting to get his record fixed (expunged) with his attorney, acknowledging he knew he had a prohibiting criminal history involving firearms. When asked about what items he brought to Rabinovich's home, Fitzpatrick stated that he only kept a shaving kit and some clothes at her home. When asked why he had a folder or pad folio containing children's pictures and cards, he responded that he took them everywhere, even on vacation.

39.    Detective Delbusso asked Fitzpatrick to describe his current financial situation, and Fitzpatrick advised "good" and made no indication that he or his business was in financial distress. When investigators confronted him with the $118,000 IRS tax bill, he first suggested that the bill may be fraudulent, and he later acknowledged he has not filed tax returns. He stated that he could pay off the tax bill with the money owed to him from a few customers. Fitzpatrick advised he owns a single family home in Virginia and two Acura NSX race cars (valued at approximately $150,000), which he normally stores in a two-car garage attached to the house at the Emerald Court Property. Fitzpatrick admitted to relocating the Acura NSX race cars to his detached garage, which was left unscathed in the fire. He acknowledged the race cars were moved out of his garage a few days prior to the house fire. Detective Delbusso asked if he had moved any of his property at the Moneta Property in Virginia, and he advised he does not go to the Moneta Property very often in the winter. Fitzpatrick advised that he made two trips to that location (over the past two months) to move his "outdoor" porch furniture from the residence on

19

Emerald Court to the Moneta Property. Fitzpatrick also advised that he moved a leather couch, originally stored in the basement at the Emerald Court Property to the Moneta Property.

### Statements of Linda Rabinovich on March 19, 2017

40.    On March 19, 2017, investigators interviewed Linda Rabinovich who advised that she recently communicated with Fitzpatrick via text, and he asked her "test questions" in an effort to ensure he was speaking to her and not the police.  During these texts, Fitzpatrick advised her that he hid money in her sweater drawer at her residence.  Rabinovich looked in the drawer and advised she found a pair of surgical socks stuffed with several packages or envelopes of money.  Rabinovich stated there were several packages stacked, each labeled 5k.  Based on the labeling, she estimated that the packages contained approximately $40,000 to $50,000. Rabinovich advised Fitzpatrick she would return it to him via courier; however, she was keeping a portion of it for a Cartier watch that was missing that she believed he took from her. Fitzpatrick agreed to the transaction, and Rabinovich arranged for the return of his money and some other personal items via a courier.  Rabinovich also voluntarily turned over a hard drive that she located at her residence amidst Fitzpatrick's other items.

41.    During follow-up correspondence with Linda Rabinovich, she advised Detective Delbusso that Fitzpatrick was very proficient with technology (computers, etc.).  She stated her "jaw dropped" when Detective Delbusso advised that Fitzpatrick originally stated to firefighters that he did not know how to use his Nest (Wi-Fi Thermostat) application.  She stated that she and Fitzpatrick went on several vacations over the past eighteen (18) months, and she never observed Fitzpatrick take his children's sentimental pictures and handmade cards on their vacations.  She advised that he always kept those items in his home office, located at the Emerald Court Property.

USAO-000538

## Statements of Ryan Fitzpatrick on March 19, 2017

42.    Additionally, on March 19, 2017, investigators interviewed Ryan Fitzpatrick, Fitzpatrick's son, regarding items that were at the house at the Emerald Court Property before the fire occurred.  Ryan Fitzpatrick is a juvenile and was accompanied by his mother for the duration of the interview.  He was shown the picture of the aforementioned computer, monitor and printer that were located in his father's detached garage during the consent search.  Ryan advised that the computer tower belonged to him and was in his bedroom at the Emerald Court Property.  He stated the last time he observed his computer in his bedroom was on Wednesday, March 8, 2017, two days prior to the house fire, when he left the house to stay with his mother because his father was having foot surgery.  He also advised the monitor and printer in the detached garage belong in his father's home office that was located at the Emerald Court Property.

43.    Ryan Fitzpatrick told investigators that, prior to the fire, he and a friend went downstairs in the Emerald Court house, and the leather couch that had been there had been removed, leaving an open space.  Several days or so later, Ryan advised, an older plaid couch from the Moneta Property had been placed in the basement of the Emerald Court home, where the open space had been and where the expensive leather couch had previously been located. Ryan was asked about the contents of the Emerald Court house before he left to stay with his mother. Ryan advised that, in the time before the fire, his father described his behavior as de-cluttering, and he and his father packed up several toys and other household items to support this effort.  When asked about sentimental items, Ryan advised that his father packed up his trophies from his racing competitions and stored them in a box on the floor.

44.    At the end of the interview, your affiant asked Ryan if he went to the shooting range with his father.  Ryan confirmed that he accompanied his father to the shooting range, and

USAO-000539

he only saw and fired the "AR."

### Search of Moneta Property and Witness Statements

45.     On or about March 15, 2017, local law enforcement investigators assisting with the investigation contacted neighbors of Fitzpatrick at the Moneta Property. A neighbor advised that Fitzpatrick does not normally stay at the Moneta Property in the winter. This neighbor advised he has recently observed Fitzpatrick make trips to the home, within previous weeks before the fire. The neighbor advised he observed "trucks and trailers" at the residence, and the neighbor specifically stated this behavior was "not normal."

46.     On March 23, 2017, your affiant applied for and received a search warrant for the Moneta Property from the Honorable Robert Ballou, United States Magistrate Judge for the Western District of Virginia. On March 24, 2017, a search of the residence resulted in the recovery of numerous items; specifically documents, photographs, and household items believed to have been located in the Emerald Court residence. Investigators seized medals, identification, other award items, high school yearbooks, old athletic jerseys and photo albums belonging to Fitzpatrick's daughter Mikaila from the closet in her room at the residence at the Moneta Property. Additionally, investigators seized two large bracket/corbels from the detached garage on the Moneta Property that were formerly attached to a wall in the residence at Emerald Court. Furthermore, these investigators took numerous photographs of items that were stored both inside the residence, and in the detached garage. These items that were photographed included, but are not limited to, a large brown leather sofa with a missing cushion, a black leather chair with chrome-colored armrests, bags of children's toys, video games, items and letters of sentimental value, outdoor patio furniture, trophies, stereo speakers, and two Nest thermostat systems attached to both a wall in the kitchen, and in the upstairs hallway of the Moneta

USAO-000540

residence.

47.    Additionally, during the execution of the warrant, several investigators were tasked to leave the scene to interview Damian Adam Harless, who lives in close proximity to this location, and who investigators learned was Fitzpatrick's close friend.  During the interview, Harless admitted to investigators that Fitzpatrick called him and requested that he remove ammunition and pre-printed checks from the Moneta Property.  This request occurred after Fitzpatrick's arrest for the aforementioned firearm and ammunition, and prior to the execution search warrant.  Harless abandoned these items to law enforcement, specifically, a box of pre-printed checks in the name of Century Enterprises, AR-15 thirty (30) round magazines, and several rounds of .223 ammunition.  Harless advised the agents that Fitzpatrick told him that the ammunition belonged to "Jon" (referring to Weizman).

48.    Through subsequent interviews of witnesses conducted after the search of the Moneta Property, it was determined that Fitzpatrick moved several items out of the Emerald Court residence to the Moneta residence.  This fact was confirmed by witness accounts of where particular property items were previously located, along with the approximate time of their observations of these items.  On April 4, 2017, investigators interviewed Fitzpatrick's son, Ryan, and presented to him a book containing the photographs of items listed in the above paragraphs, as well as those items seized or photographed during other parts of the investigation.  Ryan advised that the brown leather couch that was located and photographed in the detached garage at the Moneta Property was the couch that was formerly located in the basement of Emerald Court residence.  Ryan also recognized the black leather chair with chrome armrests as the chair that belonged in his father's home office on Emerald Court, which was used when clients would come in the office and discuss business.  Ryan advised he last saw this chair in his father's office

23

about a week prior to the fire. From other photographs taken at the Indian Ridge Property, Ryan recognized a blue Sony Playstation 4 (PS4) joystick controller and specific PS4 games that he said were at the house on Emerald Court, and were never at the Moneta Property.

49.    On April 7, 2017, investigators interviewed Fitzpatrick's daughter Mikaila and presented to her the photo book presented to her brother Ryan. Mikaila recognized the items in the photographs and advised investigators where she last saw the items. Mikaila stated that the awards, medals, and identification badges that were found at the Moneta residence were located on a hook in her closet at the Emerald Court Property. Mikaila recognized the yearbooks, athletic jerseys and photo albums as having been in her closet on Emerald Court, and she last saw them in January of this year. Mikaila recognized a photo frame that was photographed at the Moneta Property as being displayed at the Emerald Court residence and was the Christmas gift she gave Fitzpatrick on her January visit to the Emerald Court Property. Additionally, when she viewed the photos containing images of trophies at the Moneta Property, she advised that one of the trophies on the table in the living room was not typically there, and advised investigators that Fitzpatrick had a trophy display case at the Emerald Court Property with 7 to 8 trophies. Mikaila was unsure if Fitzpatrick stored trophies at the Moneta Property or if some trophies had been moved to that location.

50.    Mikaila asked investigators if they have seen the "MAC" that was in the kitchen of the Emerald Court residence. She said the Apple IMAC computer was always there, and it was a large computer. Investigators have not observed, seized, or recovered an IMAC computer in the fire debris nor any of the searches described in the above paragraphs. Investigators digging and processing the fire scene advised your affiant that some of the computer parts recovered were "shells" of the computers without any of the hard drives inside of them, and none

USAO-000542

of them resembling a large IMAC computer.

51.    On August 31, 2017, your affiant interviewed Linda Rabinovich and showed her photos of items taken at the Moneta Property during execution of the search warrant on March 24, 2017. Rabinovich advised that numerous bottles of alcoholic beverages that were located and photographed inside the kitchen pantry at the Moneta residence were not there during her last visit with Fitzpatrick to the house on Labor Day in 2016. She also recognized soups, oils, and other kitchen condiment items she knew to have been previously stored at the Emerald Court residence. In one photo, she noticed a box of "Snapware" glass bakeware items that were stored on the floor of this same pantry at the Emerald Court Property. Rabinovich stated that this item had been sitting on the counter at Emerald Court for a very long time and had never moved.

52.    Rabinovich also advised that the couch that was consistent with the description of the plaid couch (which Ryan Fitzpatrick advised replaced the leather couch on Emerald Court) was formerly stored against the sliding glass doors at the Moneta residence, and this couch was not present when investigators conducted the search of the Moneta Property on March 24, 2017. Rabinovich also advised that one of the leather cushions to the brown leather couch needed repair and Fitzpatrick asked her to have it fixed. This cushion was at Rabinovich's home when she called investigators to her house days after the fire. Rabinovich disposed of this cushion, and Fitzpatrick sent her a hostile email about her actions. Additionally, when reviewing the photos from the Moneta Property that contained images of closets packed with clothes, racing jackets, and furniture, Rabinovich advised that the closets never appeared in the crowded, cluttered, haphazard manner indicated in the photographs. Rabinovich cited the fact that Fitzpatrick would typically hang his shirts with spaces in between because he was meticulous about organization and tidiness.

USAO-000543

## Search of Emerald Court Property and Fitzpatrick's Residence on May 19, 2017

53.    On May 18, 2017, your affiant applied for and obtained a search warrant for the Emerald Court Property to include all outbuildings.  On May 19, 2017, when investigators searched the outbuilding/pole barn toward the rear of the Emerald Court Property, they did not observe Fitzpatrick's son's (Ryan) computer, which was previously observed by law enforcement days after the fire.  Ryan confirmed the fact that his computer was in his room two days prior to the fire.  (It should be noted that this computer has not been recovered yet and was claimed by Fitzpatrick for insurance purposes after the fire.)

54.    On May 19, 2017, investigators with the ATF, the Howard County Police Department and Office of the Fire Marshal also executed a federal search warrant at the then-current residence of Michael Fitzpatrick located at 10000 Town Center Drive, Unit 465, Columbia, Maryland.  At the time of the warrant, Fitzpatrick was present at the apartment and was advised of the purpose of the search.  Fitzpatrick advised he would comply with law enforcement.  Your affiant advised Fitzpatrick that she did not intend to seize his cell phone at the time; however, she needed to look through the information on the screen, photographs, and applications.  (The search warrant for the apartment was executed in conjunction with a search warrant for Fitzpatrick's person, which included his cell phone.)  Fitzpatrick provided your affiant with the passcode to enter into his phone.  The phone was given to a digital media specialist to conduct an onsite download of the information.  Investigators were able to recover pertinent items from the phone, so it was determined that the phone would be seized, rather than returned to Fitzpatrick.  The search warrant of the apartment resulted in the recovery of blueprints for the Emerald Court Property, financial documents, other records and paperwork, family photographs, checks, and electronic devices.

26

USAO-000544

### Statements of Paul Coles on May 31, 2017

55.      On May 31, 2017, investigators interviewed Fitzpatrick's Allstate Insurance agent/representative Paul Coles at his office in Alexandria, Virginia. Coles provided information regarding Fitzpatrick and Fitzpatrick's Allstate policy. On that date, investigators learned that Fitzpatrick contacted Coles on March 8, 2017, via email sending only a jpeg attachment. Coles advised that Fitzpatrick emailed him that jpeg file, which he could not open, and then suggested that he may have spoken to Fitzpatrick subsequent to that email. Coles advised investigators that Fitzpatrick followed up this conversation with a faxed copy of the MVA certificate of title for the Chevrolet Camaro. (The Camaro was one of the vehicles destroyed by the fire and fire debris two days later on March 10, 2017.) This email was later retrieved by Coles and turned over to investigators. The email confirms the date and the existence of a jpeg file. The email address Fitzpatrick utilized when sending this communication was Mike@RMF1.com. Subsequently, in May of 2017, Fitzpatrick purchased another vehicle and sent an email to Paul Coles. Within the body of the email, Fitzpatrick wrote, "Paul please add this car to my policy, picking it up later tonight or tomorrow." Fitzpatrick utilized the email account mike.rmf@gmail.com.

### Statements of Damian Adam Harless on June 28, 2017

56.      On or about June 28, 2017, investigators interviewed Damian Adam Harless regarding his communications with Fitzpatrick before and after the fire. Harless advised investigators that, in addition to retrieving the checks and the ammunition, Fitzpatrick asked that Harless move three to four trophies from a sofa table in the living room at the Moneta Property to the basement of that home. Harless advised that Fitzpatrick stated that the reason for the move was because of the cleaning service and his concern for those items. (It should be noted that Mikaila and Ryan Fitzpatrick stated that Fitzpatrick had several trophies at the Emerald Court

USAO-000545

residence, and no trophies or portions of trophies were recovered in the fire debris on the Emerald Court Property.) Harless also advised that, after the fire, Fitzpatrick asked him to utilize a particular mobile application on his cell phone that facilitated encrypted communications, in order for the two to communicate. Harless stated that he downloaded the application but deleted it after a couple days.

57.     During this same interview, Harless advised that Fitzpatrick contacted him in the fall of 2016 and asked him if he and his son Ryan could shoot a firearm on his property in Virginia. Harless complied, and he told investigators he saw Fitzpatrick assemble the firearm when he visited him that day. Your affiant asked Harless if Fitzpatrick spoke about the firearm that he shot, and if it was a manufactured firearm. Harless stuttered and responded nervously that he had no idea and that it was a "military type gun." Harless advised that he knew it was a "kit gun," adding that he did not know the caliber of the firearm. Harless stated that Fitzpatrick's firearm was in two pieces and Fitzpatrick put it together, and told him "you can buy all these different pieces and make different attachments." Harless advised that Fitzpatrick shot several rounds of ammunition through two to three magazines and was only there for a short time. Harless recalled that the firearm had a scope on it and contained a banana clip magazine. Harless later advised that Fitzpatrick knew he was prohibited from possessing firearms.

### Examination of Michael Fitzpatrick by Allstate Insurance

58.     On June 14, 2017, in accordance with Allstate policy, Fitzpatrick was required to conduct an Examination Under Oath pursuant to his insurance claim on the Emerald Court Property. This examination was conducted by counsel contracted by Allstate, and Fitzpatrick was present with his attorney. During this examination, Fitzpatrick was required to submit a "Proof of Loss" statement regarding items he lost in the fire, and their monetary values.

28

Fitzpatrick only produced the Proof of Loss statement with the explanation "To Be Determined" next to the estimated value of those items claimed. Allstate representatives provided numerous opportunities and several extensions for Fitzpatrick to submit the appropriate form, with negative results. Investigators were later able to obtain the transcript for the Examination Under Oath and noticed that Fitzpatrick was accountable for several misrepresentations, specifically, those statements regarding financial items and unpaid taxes, as well as his claim for several items that were determined to have been undamaged and removed from the Emerald Court residence prior to the fire.

59.     On August 30, 2017, your affiant learned that Allstate officially denied Fitzpatrick's insurance claim for the house and contents. On or about August 24, 2017, Allstate Senior Claim Service Consultant Bob Gionis sent a letter to Fitzpatrick denying the insurance claim for the dwelling and personal property loss citing two reasons—specifically, that Fitzpatrick requested numerous extensions to produce the Proof of Loss statement to insurance investigators, and that he made misrepresentations or concealed material facts or circumstances. Gionis specified in the letter, "it has been determined that numerous items of personal property presented by you to be destroyed in the fire were actually moved to different locations shortly before the fire, and "you moved property belonging to your son or daughter out of the house immediately before the fire."

60.     Allstate is headquartered outside the State of Maryland.

## Analysis of Seized Electronic Devices

61.     Throughout the month of March 2018, your affiant reviewed images and files obtained from a search warrant on three of Michael Fitzpatrick's electronic devices seized during the investigation. One of the files/images displayed an invoice dated September 5, 2016 (six

29

months before the fire) from "Karri's Guns" indicating Fitzpatrick's purchase of two (2) upper receivers. The invoice also included the shipping address of 11910 Emerald Court, Ellicott City, Maryland, and Fitzpatrick's email address of mike.rmf@gmail.com. Subsequent to viewing that image, your affiant requested the assistance of Special Agent/Interstate Nexus expert Jonathan Vaccarelli, who reviewed the firearm seized from Fitzpatrick's trailer on March 12, 2017. Upon review of the items, the firearm seized on that date appeared to have an upper receiver with a "K," which is indicative of the "Karri's Guns" trademark/moniker. There was no apparent serial number or other indicator to ascertain if the upper receiver attached to that firearm was one of the receivers on the invoice. However, it is important to note that, even if one of the upper receivers on that invoice is part of the seized firearm, the receipt indicates the purchase of two (2) upper receivers. Investigators have not observed, seized, or recovered the additional upper receiver in the fire debris nor any of the previous searches described in the above paragraphs. SA Vaccarelli also confirmed, based upon his knowledge and experience as a firearms interstate nexus expert that a reasonable person would only purchase an upper receiver to build or alter a firearm. There are no other commonplace uses for those items indicated on the receipt, other than to construct a firearm. (When investigators interviewed Damian Adam Harless at his residence in Virginia, Harless stated to investigators that Fitzpatrick shot a firearm on his property, which he knew it was a "kit gun," Fitzpatrick assembled the firearm, and Fitzpatrick told him "you can buy all these different pieces and make different attachments.")

## Google Services

62.     Google Inc. provides numerous free services to the users with a Google profile associated with an e-mail address commonly designated by the domain "@gmail.com." Some of these services include Gmail, Google Talk, Google Pay, Google+, Google Drive, and YouTube.

30

Gmail is a web based e-mail service. Google Talk is an instant messaging service that provides both text and voice communication. Google Talk conversation logs are saved to a "Chats" area in the user's Gmail account. Google Pay is a mobile payment system that allows its users to store debit cards, credit cards, loyalty cards and gift cards, among other things, on their mobile phones. Google+ is a social networking service. Google Drive is a file storage and synchronization service which provides users with cloud storage, file sharing, and collaborative editing. Google+ Photos (formerly Picasa Web Albums) is an image hosting and sharing web service that allows users with a Google account to store and share images for free. YouTube is a free video sharing website that allows users upload, view and share videos.

### Cellular Telephone Services

63.    In my training and experience, your affiant has learned that AT&T Wireless and Verizon Wireless are companies that provide cellular telephone services to the general public and that stored electronic communications, including retrieved and unretrieved voicemail, text, and multimedia messages for subscribers may be located on computers in the custody and control of AT&T Wireless and Verizon Wireless.

64.    Cellular telephone service providers often provide their subscribers with voicemail services.  In general, a provider will store voicemail messages on behalf of a particular subscriber until the subscriber deletes the voicemail.  If the subscriber does not delete the message, the message may remain in the system for several weeks.

65.    Among the services commonly offered by wireless phone providers is the capacity to send short text or multimedia messages (photos, audio, or video) from one subscriber's phone or wireless device to another phone or wireless device via one or more wireless service providers.  This service is often referred to as "Short Message Service" ("SMS")

31

or "Multimedia Messaging Service" ("MMS") and is often referred to generically as "text messaging." Based on my knowledge and experience, I believe that stored electronic communications, including SMS and MMS messages that have been sent or received by subscribers, may be stored by cellular telephone service providers for short periods incident to and following their transmission. In addition, providers occasionally retain printouts from original storage of text messages for a particular subscriber's account.

66.  Cellular telephone service providers typically retain certain transactional information about the use of each telephone, voicemail, and text-messaging account on their systems. This information can include log files and messaging logs showing all activity on the account, such as local and long distance telephone connection records, records of session times and durations, lists of all incoming and outgoing telephone numbers or e-mail addresses associated with particular telephone calls, voicemail messages, and text or multimedia messages. Providers may also have information about the dates, times, and methods of connection associated with every communication in which a particular cellular device was involved.

67.  Cellular telephone service providers may also retain text messaging logs that include specific information about text and multimedia messages sent or received from the account, such as the dates and times of the messages. A provider may also retain information about which cellular handset or device was associated with the account when the messages were sent or received. The provider could have this information because each cellular device has one or more unique identifiers embedded inside it. Depending upon the cellular network and the device, the embedded unique identifiers for a cellular device could take several different forms, including an Electronic Serial Number ("ESN"), a Mobile Electronic Identity Number ("MEIN"), a Mobile Identification Number ("MIN"), a Subscriber Identity Module ("SIM"), an

32

International Mobile Subscriber Identifier ("IMSI"), or an International Mobile Station Equipment Identity ("IMEI"). When a cellular device connects to a cellular antenna or tower, it reveals its embedded unique identifiers to the cellular antenna or tower in order to obtain service, and the cellular antenna or tower records those identifiers as a matter of course.

68.    Cellular telephone service providers also maintain business records and subscriber information for particular accounts. This information could include the subscribers' full names and addresses, the address to which any equipment was shipped, the date on which the account was opened, the length of service, the types of service utilized, the ESN or other unique identifier for the cellular device associated with the account, the subscribers' Social Security Numbers and dates of birth, all telephone numbers and other identifiers associated with the account, and a description of the services available to the account subscribers. In addition, providers typically generate and retain billing records for each account, which may show all billable calls (including outgoing digits dialed). Providers may also have payment information for the account, including the dates, times, and places of payments and the means and source of payment (including any credit card or bank account number).

69.    In some cases, subscribers may communicate directly with a cellular telephone service provider about issues relating to the account, such as technical problems, billing inquiries, or complaints from other users. Providers typically retain records about such communications, including records of contacts between the user and the provider's support services, as well records of any actions taken by the provider or user as a result of the communications.

70.    As explained below, information stored at the cellular telephone service provider, including that described above, may provide crucial evidence of the "who, what, why, when,

USAO-000551

where, and how" of the criminal conduct under investigation.  In my training and experience, the data pertaining to a particular cellular device that is retained by a provider can indicate who has used or controlled the cellular device.  This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence.  For example, data collected at the time of account sign-up, information relating to account payments, and communications (and the data associated with the foregoing, such as date and time) may indicate who used or controlled a cellular device at a relevant time.  Further, such stored electronic data can show how and when the cellular device and associated cellular service were accessed or used.  Such "timeline" information allows investigators to understand the chronological context of cellular device usage, account access, and events relating to the crime under investigation.  Stored electronic data may also provide relevant insight into the state of mind of the cellular device's owner and/or user as it relates to the offense under investigation.  For example, information relating to the cellular device in the possession of the service provider may indicate the owner's motive and intent to commit a crime (e.g., communications relating to the crime) or consciousness of guilt (e.g., deleting communications in an effort to conceal them from law enforcement).

71.    On August 30, 2018, your affiant spoke with a Verizon representative who advised that content maintained pursuant to preservation orders in April and May 2017 for Weizman's phone (410) 274-4522 was still preserved and available pursuant to legal process.

72.    Additionally, on August 30, 2018, your affiant spoke with an AT&T compliance analyst for legal demands who confirmed that information was preserved pursuant to the preservation order on Hardaway's phone (325) 370-3246 and available pursuant to legal process.

## **CONCLUSION**

USAO-000552

73.     Based on the information herein, your affiant submits that there is probable cause that Michael Fitzpatrick has violated federal laws related to 18 U.S.C. § 844(i),(n) (malicious destruction of property by fire and conspiracy); 18 U.S.C. § 844(h),(m) (use of fire to commit a federal felony and conspiracy); 18 U.S.C. §§ 1343 and 1349 (wire fraud and conspiracy); and 18 U.S.C. § 922(g) (prohibited person in possession of ammunition).

74.     Your affiant respectfully submits there is probable cause to believe the locations and items listed in Attachments A-1, A-2, A-3, A-4, and A-5 contain evidence, fruits, and/or instrumentalities of the aforementioned criminal violations, including the items identified in Attachments B-1, B-2, B-3, B-4, and B-5.  Your affiant makes this affidavit in support of search and seizure warrants for information located on the AT&T Wireless and Verizon Wireless servers pertaining to cellular telephones owned and operated by Weizman and Hardaway.  The foregoing information is likely to include communications regarding the fire at the Emerald Court Property and any related insurance claims; firearms, ammunition, and/or shooting ranges; the locations and movements of items of personal property to and from the Emerald Court Property; and the locations and movements of the cellular telephones owned and operated by Weizman and Hardaway.  The cellular telephones owned and operated by Weizman and Hardaway are likely to contain communications regarding the fire at the Emerald Court Property and any related insurance claims; firearms, ammunition, and/or shooting ranges; the locations and movements of items of personal property to and from the Emerald Court Property; and other evidence, fruits, and/or instrumentalities of the aforementioned criminal violations.  The prospective location information sought in the requested warrants will allow law enforcement to establish the locations of Weizman's and Hardaway's cell phones for future search and seizure. Additionally, your affiant requests a search and seizure warrant for the email account for

35

required for the service or execution of these warrants. I further request that the Court authorize execution of these warrants at any time of day or night, owing to the potential need to determine the locations of the Target Cell Phones outside of daytime hours.


Clare Jeppi
Special Agent, ATF


Subscribed and sworn before me this _____ day of _____ 2018.


The Honorable Beth P. Gesner
United States Magistrate Judge

USAO-000555

Michael Fitzpatrick to learn whether he purchased additional firearms or engaged in communications regarding insurance and/or the fire at the Emerald Court Property, and any communications with the Nest thermostat system installed inside the Emerald Court Property.

75.    This Court has jurisdiction to issue the requested search warrants for stored communications and prospective location information pursuant to 18 U.S.C. § 2703 because it is "a court of competent jurisdiction" as defined by 18 U.S.C. § 2711. Specifically, the Court is "a district court of the United States . . . that has jurisdiction over the offense being investigated." 18 U.S.C. § 2711(3)(A)(i). I anticipate executing these warrants by using the warrants to require AT&T Wireless, Verizon Wireless, and Google Inc. to disclose to the government copies of the records and other information (including the content of communications and location information) particularly described in Section I of Attachments B-1, B-2, and B-3. Upon receipt of the information described in Section I of Attachments B-1, B-2, and B-3, government-authorized persons will review that information to locate the items described in Section II of Attachments B-1, B-2, and B-3. Pursuant to 18 U.S.C. § 2703(g), the presence of a law enforcement officer is not

36

USAO-000554

18 - 2 6 4 2 BPG

**ATTACHMENT A-3**

**DESCRIPTION OF ITEMS TO BE SEARCHED**

This warrant applies to information associated with the Google account associated with the

following email address:

      mike.rmf@gmail.com

that is stored at premises owned, maintained, controlled, or operated by Google, Inc., a business

with offices located at 1600 Amphitheatre Parkway, Mountain View, CA 94043.

USAO-000564

**ATTACHMENT B-3**    18 - 2 6 4 2 BPG

**ITEMS TO BE SEIZED**

I.    **Files and Accounts to be produced by Google, Inc. for the time period August 1, 2016, through May 31, 2017.**

To the extent that the information described in Attachment A-3 is within the possession, custody, or control of Google, Inc. including any messages, records, files, logs, images, videos, or information that have been deleted but are still available to Google or have been preserved pursuant to a preservation request under 18 U.S.C. § 2703(f), Google is required to disclose the following information to the government for each account or identifier listed in Attachment A-3:

a.    The contents of all e-mails, attachments and chat messages stored in the accounts described in Attachment A-3, including copies of e-mails sent to and from the account, draft e-mails, the source and destination e-mails sent addresses associated with each e-mail, the date and time at which each e-mail was sent, and the size and length of each e-mail;

b.    All existing printouts from original storage of all of the electronic mail described above in Section I.a. above;

c.    All internet search data including all queries and location data;

d.    All transactional information of all activity of the electronic mail addresses described above in Section I.a., including log files, dates, times, methods of connecting, ports, dial ups, and/or locations;

e.    All records or other information stored by an individual using the account, including address books, contact and buddy lists, calendar data, pictures, and files;

f.    All records or other information regarding the identification of the account described above in Section I.a., to include application, full name, physical address, telephone numbers and other identifiers, records of session times and durations, the date on which the account was created, the length of service, the types of service utilized, the IP address used to register the account, log-in IP addresses associated with session times and dates, account status, alternative e-mail addresses provided during registration, all screen names associated with subscribers and/or accounts, all account names associated with the subscriber, methods of connecting, log files, means and source of payment (including any credit or bank account number), and detailed billing records;

g.    All records indicating the services available to subscribers of the electronic mail address described above in Section I.a.;

h.    Google+ subscriber information, circle information, including name of circle and members, contents of posts, comments, and photos, to include date and timestamp;

i.    Google Drive files created, accessed or owned by the accounts listed in Attachment A-3;

j.      YouTube subscriber information, private videos and files, private messages, and comments;

k.      Google+ Photos and Picasa Web Albums contents to include all images, videos and other files, and associated upload/download date and timestamp;

l.      Payment information, including billing address, shipping address, and payment instruments, associated with any Google Wallet or Google service used by the accounts listed in Attachment A-3.

m.      Google Talk conversation logs associated with the accounts listed in Attachment A-3.

## II.    Information to be Seized by Law Enforcement Personnel

a.      Any and all records that relate in any way to the email accounts described in Attachment A-3 which is evidence, fruits, and instrumentalities of violations of 18 U.S.C. § 844(i),(n) (malicious destruction of property by fire and conspiracy); 18 U.S.C. § 844(h),(m) (use of fire to commit a federal felony and conspiracy); 18 U.S.C. §§ 1343 and 1349 (wire fraud and conspiracy); and 18 U.S.C. § 922(g) (prohibited person in possession of firearms and/or ammunition), specifically that relate to the following:

i.      Firearms, ammunition, and shooting ranges;

ii.      Home and/or vehicle insurance policies, coverage, or claims;

iii.      Arson, the use of incendiary or ignitable materials, and/or the destruction of property by fire;

iv.      Movement, transportation, or relocation of personal property;

v.      Evidence indicating how and when the cellular device and associated cellular service was used to determine the chronological context of cellular device use, account access, and events relating to the crimes under investigation;

vi.      Evidence indicating the geographic location of the cellular device at times relevant to the investigation;

vii.      Evidence indicating the cellular device owner or user's state of mind as it relates to the crime under investigation;

viii.      The identity of the person(s) who created the account associated with the cellular device and/or used the cellular device, including records that help reveal the whereabouts of such person(s); and

ix.      The identity of the person(s) who sent to and/or received communications from the cellular device about matters relating to the above listed matters, including records that help reveal their whereabouts.

USAO-000566

b.      All existing printouts from original storage which concern the categories identified in subsection II.a; and

c.      All "address books" or other lists of contacts.

USAO-000567